**NOT FOR  PUBLICATION**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE
HONORABLE JOEL B. ROSEN

KEVIN HAILEY, et al.,                          :

          Plaintiffs,                   :

    v.                                        :          Civil No. 01-3967

CITY OF CAMDEN, et al.,                   :

          Defendants.                  :          **OPINION**

**APPEARANCES:**

Gregg L. Zeff, Esquire
Frost & Zeff, Esqs.
430 Route 70 West
Cherry Hill, NJ 08002
For the plaintiffs

Cheryl L. Cooper, Esquire
Holston, Macdonald, Uzdavinis & Ziegler
A Professional Corporation
66 Euclid Street
P.O. Box 358
Woodbury, NJ 08096
For the defendants

**ROSEN**, United States Magistrate Judge:


I.      **Introduction**

      Presently before the court is the defendants' renewed motion for judgment as a matter of

law pursuant to Fed. R. Civ. P. 50(b), for a new trial, or in the alternative for remittitur pursuant

to Fed. R. Civ. P. 59(a).  Also before the court is the plaintiff's motion for injunctive and

declaratory relief.   After having carefully considered the submissions of the parties, the trial

testimony, and the relevant jurisprudence, and the argument of counsel conducted on the record on June 5, 2006, the court shall grant in part the defendants' motion and order a new trial on certain issues as detailed below.  And the court shall deny without prejudice the motion for declaratory and injunctive relief.

## II.    Factual and Procedural Background

On August 20, 2001, Kevin Hailey and Terrence Crowder, two African-American Deputy Fire Chiefs for the City of Camden, filed suit against the City of Camden, former Fire Chief Herbert Leary, Chief Joseph Marini, former Mayor Milton Milan, and former City Attorney John Misci, Jr. alleging racial discrimination, hostile working environment, and retaliation in violation of, *inter alia*, Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, as amended, the Civil Rights Act of 1871, 42 U.S.C. §§ 1981, 1983, 1988, and the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1, et seq.

The case proceeded to trial on November 10, 2004.  The plaintiffs voluntarily dismissed Defendants Milan and Misci as well as their Title VII  claims.  The case was presented to the jury which returned a verdict in favor of the plaintiffs and against the defendants on all claims.  The defendants, thereafter, retained new counsel for the post-trial motions and the instant motion followed.

## III.   Discussion

### A.  Standard for Renewed Motion for Judgment as a Matter of Law and New Trial

Federal Rule of Civil Procedure 50 allows parties to request judgment as a matter of law and provides:

> **(a) Judgment as a Matter of Law**.
>
> **(1)** If during a trial by jury a party has been fully heard on an issue

and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue.

**(2)** Motions for judgment as a matter of law may be made at any time before submission of the case to the jury.  Such a motion shall specify the judgment sought and the law and the facts on which the moving party is entitled to the judgment.

**(b) Renewing Motion for Judgment After Trial;  Alternative Motion for New Trial.**  If, for any reason, the court does not grant a motion for judgment as a matter of law made at the close of all the evidence, the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion.  The movant may renew its request for judgment as a matter of law by filing a motion no later than 10 days after entry of judgment-- and may alternatively request a new trial or join a motion for a new trial under Rule 59.  In ruling on a renewed motion, the court may:
**(1)** if a verdict was returned:
**(A)** allow the judgment to stand,
**(B)** order a new trial, or
**(C)** direct entry of judgment as a matter of law;  or
**(2)** if no verdict was returned;
**(A)** order a new trial, or
**(B)** direct entry of judgment as a matter of law.

**(c) Granting Renewed Motion for Judgment as a Matter of Law;  Conditional Rulings;  New Trial Motion**

**(1)** If the renewed motion for judgment as a matter of law is granted, the court shall also rule on the motion for a new trial, if any, by determining whether it should be granted if the judgment is thereafter vacated or reversed, and shall specify the grounds for granting or denying the motion for the new trial.  If the motion for a new trial is thus conditionally granted, the order thereon does not affect the finality of the judgment.  In case the motion for a new trial has been conditionally granted and the judgment is reversed on appeal, the new trial shall proceed unless the appellate court has otherwise ordered.  In case the motion for a new trial has been conditionally denied, the appellee on appeal may assert error in that denial;  and if the judgment is reversed on appeal, subsequent

proceedings shall be in accordance with the order of the appellate court.

Courts may grant judgment as a matter of law where "there is no legally sufficient evidentiary basis for a reasonable jury" to find in favor of the non-moving party.  Fed. R. Civ. P. 50(a).  When a court denies an initial motion under Rule 50(a), the party may renew its motion following verdict.  Fed. R. Civ. P. 50(b).  Upon such a renewed motion, the district court must determine whether, viewing the evidence in the light most favorable to the verdict-winner, a reasonable jury could have found for the prevailing party. Johnson v. Campbell, 332 F.3d 199, 204 (3d Cir. 2003).  The Third Circuit has cautioned that Rule 50 motions should be granted "sparingly."  Id. at 204.  Thus, such motions should be granted only where "the record is critically deficient of the minimum quantum of evidence" in support of the verdict. Gomez v. Allegheny Health Servs., Inc., 71 F.3d 1079, 1083 (3d Cir. 1995).

Parties may in the alternative move for a new trial under Fed. R. Civ. P. 59:

> **(a) Grounds.** A new trial may be granted to all or any of the parties and on all or part of the issues (1) in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States; and (2) in an action tried without a jury, for any of the reasons for which rehearings have heretofore been granted in suits in equity in the courts of the United States. On a motion for a new trial in an action tried without a jury, the court may open the judgment if one has been entered, take additional testimony, amend findings of fact and conclusions of law or make new findings and conclusions, and direct the entry of a new judgment.

The defendants base their request for a new trial both on insufficiency of the evidence as well as on trial error.

"Motions for new trial are seldom granted, especially when the asserted ground is insufficiency of evidence and the subject matter is not particularly complex and deals with

material which is familiar and simple." Helena Chemical Co. v. Nelson, 2000 WL 1880331

(D.N.J.2000) (citing Lind v. Schenley Indus., Inc., 278 F.2d 79, 90-91 (3d Cir.1960)).  "The party

challenging the verdict . . . bears a heavy burden of showing that the verdict is against the weight

of the evidence and that 'a miscarriage of justice would result if the verdict were to stand.' "  Id.

(citing Klein v. Hollings, 992 F.2d 1285, 1290 (3d Cir.1993)).  "[A] new trial should only be

granted where 'a miscarriage of justice would result if the verdict were to stand,' the verdict

'cries out to be overturned,' or where the verdict 'shocks our conscience.' "  Price v. Delaware

Dept. of Correction, 40 F. Supp. 2d 544, 550 (D. Del. 1999) (citing Williamson v. Consolidated

Rail Corp., 926 F.2d 1344, 1353 (3d Cir. 1991)).   "[T]he court is permitted to consider the

credibility of witnesses and to weigh the evidence, however the court must 'exercise restraint to

avoid usurping the jury's primary function.' "  Blakey v. Continental Airlines, Inc., 992 F. Supp.

731, 734 (D.N.J. 1998) (citing Hurley v. Atlantic City Police Dept., 933 F. Supp. 396, 403

(D.N.J. 1996), rev'd in part on other grounds, 174 F.3d 95 (3d Cir. 1999)).

     The defendants similarly request a new trial based on trial court error.  Federal Rule of

Civil Procedure 61 governs such motions and provides:

> No error in either the admission or the exclusion of evidence and
> no error or defect in any ruling or order or in anything done or
> omitted by the court or by any of the parties is ground for granting
> a new trial or for setting aside a verdict or for vacating, modifying,
> or otherwise disturbing a judgment or order, unless refusal to take
> such action appears to the court inconsistent with substantial
> justice.  The court at every stage of the proceeding must disregard
> any error or defect in the proceeding which does not affect the
> substantial rights of the parties.

Fed. R. Civ. P. 61.  The district court is granted broad latitude "when the reason for interfering

with the jury verdict is a ruling on a matter that initially rested within the discretion of the court,

e.g. evidentiary rulings, see Bhaya v. Westinghouse Elec. Corp., 922 F.2d 184, 187 (3d Cir.

1990), . . . or prejudicial statements made by counsel[, s]ee Lind v. Schenley Indus., Inc., 278

F.2d 79, 90 (3d Cir. 1960)." Klein v. Hollings, 992 F.2d 1285, 1289-90 (3d Cir. 1993).  Wihtin

this context, under Federal Rule of Civil Procedure 61, the court must determine (1) whether an

error was in fact made, and (2) whether the error was so prejudicial that a refusal to grant a new

trial would be "inconsistent with substantial justice." Fed. R. Civ. P. 61.

### B.  Requests/Assertions of Error

#### 1.  Punitive Damages Against the City of Camden based on §§ 1981 and 1983

While there are numerous assertions of error in the motion before the court, two cause

this court greatest concern and both involve Defendant the City of Camden.

The first is the City's identification of what this court considers to be reversible error in

the Jury Interrogatories, specifically, Section V of the Jury Interrogatories, which provides as

follows:

> Section V.  Punitive Damages: Plaintiff Hailey
>
> A.  Plaintiff Hailey v. the City of Camden
>
> If you awarded damages, even nominal damages of one dollar, to
> Plaintiff Hailey and against the City of Camden in any of the above
> sections, you must now consider the issue of punitive damages
> against Defendant the City of Camden.  (Refer to Instruction 37 if
> you awarded damages in Sections I and/or II.  Refer to Instruction
> 38 if you awarded damages in Sections III and/or IV.)
>
>> We find that punitive damages should be awarded
>> to Plaintiff Hailey and against Defendant the City of
>> Camden in the following amount:
>>
>> $ _____
>> (State the full amount or, if none, write the word "none")
>
> Proceed to Question B
>
> B. Plaintiff Hailey v. Defendant Leary

If you awarded damages, even nominal damages of one dollar, to
Plaintiff Hailey and against Defendant Leary in any of the above
sections, you must now consider the issue of punitive damages
against Defendant Leary.  (Refer to Instruction 37 if you awarded
damages in Sections I and/or II.  Refer to Instruction 38 if you
awarded damages in Sections III and/or IV.)

>We find that punitive damages should be awarded
>to Plaintiff Hailey and against Defendant Leary in
>the following amount:

$ _____
(State the full amount or, if none, write the word "none")

Proceed to Question C

C.  Plaintiff Hailey v. Defendant Marini

If you awarded damages, even nominal damages of one dollar, to
Plaintiff Hailey and against Defendant Marini in any of the above
sections, you must now consider the issue of punitive damages
against Defendant Marini.  (Refer to Instruction 37 if you awarded
damages in Sections I and/or II.  Refer to Instruction 38 if you
awarded damages in Sections III and/or IV.)

>We find that punitive damages should be awarded
>to Plaintiff Hailey and against Defendant Marini in
>the following amount:

$ _____
(State the full amount or, if none, write the word "none")

Jury Interrogatories, Section V.[1]  As a review of the above reveals, each of these subsections A,
B, and C are identical save for the names of the defendants to which they refer.  I shall explain in
more detail below how this is in error and how this error cannot be allowed to stand.

Although the City asserts that the court charged the jury with punitive damages on the
federal claims, this was not the court's intention.  Rather, as trial counsel may recall, during the
court's off-the-record discussion of the defendants' objection to charging the jury on punitive

--------

[1]  Section V concerning Plaintiff Crowder is identical to Plaintiff Hailey's Section V, save
for the substitution of Plaintiff Crowder for Plaintiff Hailey.

damages against the City under sections 1983 and 1981, all agreed that such a charge would not

be viable as no punitive damages could lie against the City under these statutes.  It is unfortunate

that this discussion occurred off-the-record only.  However, that is of no moment.  Because

whether the court and the parties memorialized these discussions on the record would not

ameliorate the confusion Section V of the jury interrogatories created on this issue.[2]

Following the agreement of the parties to drop punitive damages against the City based

on the federal statutes, the court removed reference to the City specifically in Instruction 37 of

the jury charge entitled "Punitive Damages – 42 U.S.C. § 1981 and 1983."  The charge therefore

did not specifically reference the City.  The charge was still necessary for the individual

defendants and thus remained.  However, Instruction 37 did not specifically name only the

individual defendants.

Although the court intended to reference only the individual defendants, the charge used

general language in the instruction. For example, the Instruction 37 states:  "If you find in favor

of either of the plaintiffs and against any or all of the defendants . . ." and "You may assess

punitive damages against any or all of the defendants or you may refuse to impose punitive

damages."  This general language could quite easily and logically be read to encompass the City

as well as the individual defendants.

The general language of Instruction 37 assumes greater import when read in conjunction

with the serious typographical error in the Section V Interrogatory.  Specifically, the court merely

changed the defendants' names in each of the subsections A, B, and C to Section V.  Thus, as to

---

[2]  The plaintiffs argue that the defendants did not preserve their objection on this issue, and a close review of the record supports that argument (see Tr. 12/3/04).  Nevertheless, as the following discussion will explicate, the court finds that the error in Section V Interrogatory vis-a-vis the City of Camden is sufficient to meet the heightened standard of Fed. R. Civ. P. 51(d)(2). See Franklin Prescriptions, Inc. V. New York Times Co., 424 F.3d 336, 339 (3d Cir. 2005).

the City of Camden, subsection A refers the jury to Instruction 37, punitive damages under 42 U.S.C. §§ 1981 and 1983.  In addition to this reference to Instruction 37, the Interrogatory similarly refers the jury to Sections I and II of the Interrogatory.  Section I of the Jury Interrogatory asks the jury in three separate sub-parts whether the jury finds each of the three defendants liable for Race Discrimination under 42 U.S.C. §§ 1981 and 1983.  Section II of the Jury Interrogatory pertains only to the claim of First Amendment retaliation by Defendants Leary and Marini against the plaintiffs.  Neither of these sections supply a basis for punitive damages against the City of Camden, indeed, Section II does not concern the City of Camden at all.

Although the parties and the court had an opportunity to review this interrogatory, none recognized this error.  The question before the court now, therefore, is whether this error is sufficient to vitiate the punitive damages award against the City of Camden.

The plaintiff argues that the generic language of Instruction 37, coupled with the court's intention, should be sufficient to preserve the charge.  However, juries are not charge with intentions but with necessarily specific and particular words.  By referring the jury back to Instruction 37 (punitive damages under §§ 1981 and 1983) **and** Interrogatory Section I and II (race discrimination under §§ 1981 and 1983 and First Amendment retaliation under § 1983 respectively), in addition to Sections III (NJLAD race discrimination) and IV (NJLAD hostile work environment), the court can come to no other conclusion but that the jury incorporated all claims into their consideration of the punitive damages verdict against the City of Camden.  The error is not, therefore, harmless, as it is highly probable that the error contributed to the judgment.  See Hurley v. City of Atlantic City, 174 F.3d 95, 124 (3d Cir. 1999).

The plaintiffs also attempt to save the punitive damages verdict against the City by arguing that the entire punitive damages amount may be attributed to the viable New Jersey Law

Against Discrimination punitive damages claim, and thus the reference to the federal claims was harmless.  (See Pl.'s Br. at 59-64).  The plaintiffs cite numerous cases that stand for the general proposition that courts should and do make every effort to read a jury's answers to interrogatories consistently, none of which speak specifically to the situation at hand.  The one case on which the plaintiffs in particular rely, Hurley v. Atlantic City Police Department, 174 F.3d 95 (3d Cir. 1999), does not persuade this court.

In Hurley, a claim of sexual harassment by a female Atlantic City Police Officer, the Third Circuit found that the district court had improperly charged the jury on the quid pro quo discrimination claim.  The court did not, however, reverse the verdict based on this error. Rather, the court found that the jury's verdict could rely on the remaining counts of sexual harassment because the claims were distinct and the evidence supporting the harassment claim was overwhelming.

The most significant distinction between the Hurley case and the instant case is that in Hurley, the court submitted a general verdict sheet to the jury.  Thus, the verdict for the plaintiff could have relied on one or all of the claims.  The Third Circuit determined that the quid pro quo evidence was so weak, that no reasonable jury would have relied on it in reaching its verdict.  In explaining, the court opined:

> The dissent persuasively identifies the reasons that the quid pro quo claim was the least tenable of Hurley's claims. . . . In fact, the conduct of which she complained was part of the hostile work environment she experienced, and this would necessarily have been apparent to the jury. But in light of the total record here, we are satisfied that no jury would have found the defendants liable solely on the basis of the quid pro quo instruction. Multiple sources – including physical evidence – corroborated the most egregious examples of sexual harassment, including the tampon incident and the obscene graffiti, while the only evidence of [the defendant's quid pro quo] suggestion came from Hurley's testimony. To us, it is

> inconceivable that a jury would have believed her testimony on this
> one issue, concluded that the ACPD was vicariously liable for one
> advance, and discounted the other incidents, which were
> sufficiently pervasive to constitute a hostile environment. Juries
> may be unpredictable, but we are not willing to posit total illogic,
> which would be contrary to our faith in the jury system as a whole.
> We are thus persuaded that any error was harmless.

Hurley, 174 F.3d at 120-121 (internal citations and notes omitted).

In contrast to Hurley's general verdict sheet, this court, at the parties' request, submitted specific interrogatories to the jury.  In so doing, the court directed each step of the jury's deliberations.  Moreover, both the section 1981/1983 and the New Jersey Law Against Discrimination claims sought recovery for racial discrimination: they are not distinct claims in the same way as are harassment and quid pro quo discrimination at issue in Hurley.  Thus, Hurley is inapposite, and this court is not now free to rely upon the inherent strength of the jury system to rationalize a parsing of the verdict.  The defendants' motion for a new trial on this issue shall be granted.

This decision does not, however, complete the analysis.  At oral argument, counsel for the plaintiffs posited that granting a new trial on punitive damages as to the City of Camden only would be inconsistent with substantial justice.  Counsel argued that the jury's punitive damages decision vis-a-vis the City necessarily had an impact on its decision not to assess punitive damages against the individual defendants.  Because of the error in Section V of the Jury Interrogatory, this court agrees.

The jury found that the individual defendants had committed First Amendment violations in Jury Interrogatory Section II.  The punitive damages Interrogatory directed the jury to consider punitive damages against *the City* as a result of the *individual defendants'* First Amendment violations found in Section II.  This reference would have caused the jury to understand the

liability structure as one resembling respondeat superior; that is, that the City could be held liable

for the conduct of the individual defendants vis-a-vis their First Amendment violations.

Consequently, the jury may have subsumed the individual punitive liability in the City's punitive

liability.  This court cannot state with confidence that the profound confusion flowing from the

court's typographical error did not vitiate the entire punitive damages scheme.  And, although the

court shares the Third Circuit's faith in the jury system, see Hurley, 174 F.3d at 121, the court

cannot sustain a punitive damages finding derived from such inaccurate Interrogatories.

        The court thus finds that it committed an error in the Jury Interrogatory, which error was

so prejudicial that a refusal to grant a new trial would be "inconsistent with substantial justice",

and that for the error to be corrected, a new trial on punitive damages must be had as to all

parties.  Fed. R. Civ. P. 61.

### 2.  Nominal Damages

        With no jurisprudential support, the defendants assert plain error resulting from the

court's nominal damages interrogatories.  Specifically, the defendants argue that the

interrogatories erred by "instruct[ing] the jury to award damages against the defendants in the

amount of $1.00, even if it determined that plaintiffs suffered no compensable damages[.]"

(Def.'s Br. at 9).  The defendants' position runs directly counter to relevant jurisprudence.  The

Third Circuit recently discussed the import of the nominal damages charge:

> Racial discrimination, according to the Supreme Court, is a
> "fundamental injury to the individual rights of a person," Goodman
> v. Lukens Steel, 482 U.S. 656, 661, 107 S.Ct. 2617, 96 L.Ed.2d
> 572 (1987), and the inability to buy or lease real property can be
> considered one of the badges and incidents of slavery. See also The
> Civil Rights Cases, 109 U.S. 3, 22-23, 3 S.Ct. 18, 27 L.Ed. 835
> (1883). Indeed, even absent proof of actual injury, nominal
> damages are to be awarded to recognize violation of a
> constitutional right. Carey v. Piphus, 435 U.S. 247, 266-67, 98

> S.Ct. 1042, 55 L.Ed.2d 252 (1978).  This entitlement is not
> automatic, however, "but rather, it is incumbent upon the plaintiff
> to make a timely request for nominal damages." <u>Campos-Orrego v.
> Rivera</u>, 175 F.3d 89, 98 (1st Cir.1999). In this instance, the
> plaintiffs requested and received an instruction on nominal
> damages, but failed to bring to the District Court's attention their
> contention that the jury should have been instructed that nominal
> damages are mandatory with a finding of discrimination.

<u>Alexander v. Riga</u>, 208 F.3d 419, 429 (3d Cir. 2000).  The court's instructions confirmed the

mandatory nature of nominal damages, upon request of the plaintiffs, and the court finds that the

interrogatories are not in error.

### 3.  Wage Loss Award Based Upon Speculation and Against Weight of the Evidence

The defendants object to the wage loss award of Plaintiffs Hailey and Crowder, $70,000

and $116,000 respectively, as speculative.  The defendants argue that because the plaintiffs did

not present expert testimony or documentary evidence on the issue of damages but relied only on

their own testimony, the damages award cannot stand.  The defendants generally rely on the so-

called "rule of certainty" to refute the plaintiffs' wage loss award.  Notably, none of the cited

cases concern lost wages.  Additionally, the Third Circuit has remarked that the rule is not to be

strictly applied.  Rather, "'[w]here a wrong has been committed and damages have resulted, mere

uncertainty as to the amount of damages will not preclude a recovery even though proof of the

amount of damages is inexact.'" <u>Lightning Lube, Inc. v. Witco Corp.</u>, 4 F.3d 1153, 1176 (3d Cir.

1993) (quoting <u>Viviano v. CBS, Inc.</u>, 251 N.J. Super. 113, 129 (App. Div. 1991)).  The

defendants supply no legal support for their assertion that the plaintiffs must present either expert

testimony or documentary evidence to permit a finding of lost wages.  Moreover, courts have

found that credible testimony need not be buttressed by expert testimony, tax returns, or other

documentation.  See <u>e.g.</u> <u>Hawkins v. 248 Haynes St. Assoc., Inc.</u>, 1995 WL 378462 at *9 (N.J.

Super. App. Div. 1995).  The trial testimony is replete with specific references to the plaintiffs'

earning activities, salary comparisons, and losses based on the activities of the defendants. (See

e.g. Tr. 11/19/04 at pp. 114-116).  Thus, the court finds the defendants' objection to lost wages

without merit.

### 4.  Testimony of Alleged Acts of Discrimination and/or Retaliation Occurring After August 20, 2001

The defendants further argue that the court erred in permitting evidence of alleged acts of

discrimination occurring after the law suit's filing date of August 20, 2001.  Specifically, the

defendants assert that the plaintiffs did not make allegations of continuing violation in either the

complaint or the final pretrial order.  (See Defs.' Br. at 13-18).

First, the complaint contains numerous references to continuing violation theories.  For

example, paragraph 51 of the complaint provides, "Despite the foregoing policy, Chief Marini

selected Thomas Quinn and Robert Zieniuk, both Caucasians as Acting Deputy Fire Chiefs.

Furthermore, Marini has allowed the racial discriminatory practices to continue since he has

become Fire Chief."  The plaintiffs also included a statement of continuing harm in their

Wherefore clause, requesting that the court "enter a declaratory judgment that Defendants'

discriminatory and retaliatory acts, policies, practices and procedures complained of herein, have

violated and continue to violate the rights of Plaintiffs . . . [and] enjoin Defendants from

continuing in their discriminatory and retaliatory practices."  Thus, the continuing violations

theory was apparent from the outset of the case.

The Joint Final Pretrial Order ("FPTO") similarly reflects both the plaintiffs' continuing

violation theory as well as the plaintiffs' intention to introduce evidence post-dating August 20,

2001.  The plaintiffs' contested facts describe a continuing pattern and practice of discrimination

by the defendants.  For example, the FPTO provides:  "51. Defendants have engaged in a pattern and practice of denying Hailey and Crowder promotions due to his race despite his qualifications and experience.  52. This practice is a continued practice of discrimination and retaliation against Plaintiff due to his race and for speaking out on public issues concerning overtime and race that Plaintiff has made during his course of employment."  (FPTO, Part III, ¶¶ 51, 52).  The FPTO further provides:  "79. Defendants engaged in a pattern and practice to keep Crowder, due to his race, from obtaining the necessary experience to gain promotions in the department and/or not promoting Plaintiff despite his experience and qualifications.  80. This practice is a continued practice of discrimination and retaliation against Crowder for speaking out on public issues concerning overtime, race and grievances that Plaintiff has made during his course of employment."  Additionally, the plaintiff's list of exhibits included numerous documents that post-date August 20, 2001.  (See e.g. FPTO at 30-35, P-56, P-59, P-62, P-65, P-72, P-82, P-89, P-108, P-128, P-129, P-143).  Notably, the defendants did not object to any these documents based on the date on which they were created or the time period which they cover.

More importantly, even the defendants indicated an intention to enter evidence that post-dates August 20, 2001.  The defendants indicate that Defendant Chief Marini will testify to his management practices while Chief of the Fire Department:

> Mr. Marini will give a detailed history of the City of Camden Fire Department and its operations.  He will also detail his efforts concerning the management of the Fire Department.  He will give testimony about his knowledge of plaintiffs' careers.  He will testify about the earnings of the plaintiffs as compared with other minorities and/or non-minority members of the Fire Department.

(FPTO at 24).  Additionally, the defendants indicated an intention to introduce documentary evidence that post-dated August 20, 2001.  (See e.g. D-11, D-32).  Most notably, however, is the

failure of the defendants to include any objection concerning testimony that post-dated August 20, 2001.  This absence of objection is highlighted by the presence of an objection to evidence prior to 1999.  (See FPTO at 42, Part IX. 2).

The defendants did object to entry of any evidence after August 20, 2001 at trial.  That objection consisted of the following argument:

> Mr. Gonzalez:  Judge, at this point in time I have to make an objection to any further incidents after August 20th, 2001.
> Therefore, it is irrelevant as to any harm he might have suffered after 2001.
> The Court:  Counsel?
> Mr. Zeff:  If I am not mistaken, there was a motion in limine filed by the defense on this issue, and you made a ruling that it is a hostile work environment case and that incidents that have occurred prior to the date of the filing are not only relevant, but also provide background information as to that.
> Mr. Gonzalez:  I am talking about subsequent.
> Mr. Zeff:  Subsequent?
> Mr. Gonzalez: Yes.
> Mr. Zeff:  It's been continuing.  It's been put in the complaint that way.
> The Court:  I have to look at the pretrial orders.
> Mr. Zeff:  Not only for things that are subsequent, but the complaint has been amended to things that happened last week.
> The Court:  I will permit it.

(Tr. 11/15/04 135:5 - 136:7).  This was the entirety of counsel's objection to testimony of incidents occurring after August 20, 2001.  The court considered and ruled on the defendants' continuing violations objections (which ruling the court considers anew infra), finding that the plaintiffs did allege such a theory and that that theory was thoroughly litigated both over the course of trial preparation and at trial.  The defendants did not assert that they were prejudiced in their preparedness for trial on this issue, and the plaintiffs' pleadings as well as the defendants' own pretrial submissions included information that post-dates August 20, 2001.  Consequently, the court finds this argument wholly without merit.

### 5.  Liability Under 42 U.S.C. § 1983

#### a.  Municipal Liability

This is the second area in which the court has grave concerns.  In the Rule 50 motion and now in the renewed motion, the City of Camden argued that the State of New Jersey was in control of the City during part of the relevant time period.  The reference in the Rule 50 motion was vague and unsupported by any jurisprudence.  Similarly, the reference in the renewed motion did not satisfy the court that the issue should not have been presented to the jury.

Upon review of the instant motion, however, the court's concern was aroused when both the City of Camden and the plaintiffs relied on the identical person as the individual with "final decision-making authority" – Norton Bonaparte, the Business Administrator.  The defendants asserted that Mr. Bonaparte was not a City employee.  The plaintiffs argued that he indeed was. The trial testimony provided insufficient guidance for the court to determine.  Therefore, to ensure that no injustice had been wrought, the court requested additional briefing on the issue.

After having carefully considered the supplemental briefing, the court finds that a new trial must be granted to Defendant the City of Camden on the issue of liability under 42 U.S.C. §1983.

#### (i)  Municipal Liability under Section 1983

The Supreme Court has articulated the "guiding principles" for municipal liability as follows:

> First, a majority of the Court agreed that municipalities may be held liable under § 1983 only for acts for which the municipality itself is actually responsible, "that is, acts which the municipality has officially sanctioned or ordered."  Pembaur [v. City of Cincinnati], 475 U.S. [469,] 480, 106 S.Ct., at 1298.   Second, only those municipal officials who have "final policymaking authority" may by their actions subject the government to § 1983 liability.

> Id., at 483, 106 S.Ct., at 1300 (plurality opinion).   Third, whether a
> particular official has "final policymaking authority" is a question
> of *state law*.   Ibid. (plurality opinion).   Fourth, the challenged
> action must have been taken pursuant to a policy adopted by the
> official or officials responsible under state law for making policy in
> *that area* of the city's business.   Id., at 482-483, and n. 12, 106
> S.Ct., at 1299-1300, and n. 12 (plurality opinion).

City of St. Louis v. Praprotnik, 485 U.S. 112, 123 (1988) (emphasis in original).  On the topic of

determining which official may have that final policy-making authority, the Court stated:

> We begin by reiterating that the identification of policymaking
> officials is a question of state law.  "Authority to make municipal
> policy may be granted directly by a legislative enactment or may be
> delegated by an official who possesses such authority, and of
> course, whether an official had final policymaking authority is a
> question of state law."  Pembaur v. Cincinnati, *supra*, 475 U.S., at
> 483, 106 S.Ct., at 1300 (plurality opinion). Thus the identification
> of policymaking officials is not a question of federal law, and it is
> not a question of fact in the usual sense.   The States have
> extremely wide latitude in determining the form that local
> government takes, and local preferences have led to a profusion of
> distinct forms.   Among the many kinds of municipal corporations,
> political subdivisions, and special districts of all sorts, one may
> expect to find a rich variety of ways in which the power of
> government  is distributed among a host of different officials and
> official bodies.   See generally C. Rhyne, The Law of Local
> Government Operations §§ 1.3-1.7 (1980).   Without attempting to
> canvass the numberless factual scenarios that may come to light in
> litigation, we can be confident that state law (which may include
> valid local ordinances and regulations) will always direct a court to
> some official or body that has the responsibility for making law or
> setting policy in any given area of a local government's business.

City of St. Louis, 485 U.S. at 124-125.  Thus, it was the court's duty to determine what

individual had "final policy-making" authority sufficient for liability to attach to the City.

At the time of trial, the court was not fully apprised of the basis for defendants' objections

to its instruction regarding municipal liability.  Indeed, much of what has recently come to light

was never addressed to the court before or during trial.  The supplemental briefing to the instant

motion has greatly assisted the court in this task.  The relevant question being can Norton

Bonaparte, as the final policy-maker, subject the City of Camden to liability under section 1983.

If the answer is yes, then the verdict may stand in this respect.  If the answer is no, then it cannot.

A review of the relevant legislation regarding control and oversight of the City of Camden

reveals that the answer lies somewhere in between.

### (ii)  Legislative Basis for State Oversight

Three legislative acts define control of the City of Camden during the relevant time

period.[3]

First, Public Law 1998, Chapter 45, the Annual Appropriates Act for the State's 1998-

1999 fiscal year authorized the Local Finance Board ("LFB") to create, by resolution, a Financial

Review Board ("FRB") for the City of Camden.  P.L. 1998, c. 45 (N.J.A.C. 5:30, Subchapter 13,

"Financial Review Boards").[4]  The defendant asserts that establishment of this rule supplanted

the City of Camden as the governing authority in exchange for governance by the Financial

Review Board, an arm of the State of New Jersey.  As a consequence, the City asserts that it

could not be subject to liability under section 1983 as no employee of the City of Camden had

"final policy-making authority."

While establishment of the financial review board wrested some authority from the City

_____

[3] Although the defendants have argued in the instant motion that neither that period
before August 20, 1999 nor that period after August 20, 2001 should be included as part of the
relevant time period for this case.  The court rejected the former argument before trial and the
court rejects the latter argument herein.  The case involves a continuing violation of anti-
discrimination statutes.  Such was pled and such was tried.  Consequently, the relevant period ran
continuously for the period of the plaintiffs' employment to the time of trial, December 2004.

[4] This subchapter was created for the City of Camden pursuant to an Emergency New
Rule Adopted and Concurrent Proposed New Rule authorized by the Acting Chair of the Local
Finance Board, with gubernatorial approval, effective August 1998.  Effective October 20, 2003,
subchapter 13 was amended to generically cover any municipality.

of Camden, it did not supplant the City as a governing body.  Rather, this legislation merely

provided for financial oversight of the City of Camden on a general level.  Day to day

management of the City remained with the City.  And the City's own contemporary analysis of

its autonomy under the financial review board belies its current position.

In April 2000, the LFB conducted a hearing and evaluated the financial condition of the

City.  Following that hearing, on May 10, 2000, the LFB placed the City under its supervision

pursuant to the second relevant act, the "Local Government Supervision Act of 1947", N.J.S.A.

52:27BB-1 to 100 ("Supervision Act").  The LFB then proceeded to dismiss the City's then-

Business Administrator and directed it to appoint Norton N. Bonaparte, Jr., as the City's business

administrator.  The City sued the LFB and the Director of the Division of Local Government

Services of the Department of Community Affairs, claiming that "the LFB and the Director have,

in this instance, exceeded their powers under the Supervision Act and violated long-standing

traditions of 'home rule' and local autonomy."  City of Camden v. Kenny, 336 N.J. Super. 53, 56

(App. Div. 2000).  Specifically, the City argued that the LFB did not have the authority to hire,

fire, or otherwise dictate whom the City must appoint as its business administrator.  The court,

after careful consideration of the City's arguments and the intent of the Supervision Act, found

that beginning on May 10, 2000, the LFB had "strong remedial powers . . . to correct gross

financial failings at the municipal level" and that these powers "must prevail over the general

power of the Mayor and City Council to appoint and confirm a business administrator."  336 N.J.

Super at 61.  The court noted that the Supervision Act "specifically speaks to personnel reform,

whether classified or unclassified, union or non-union."  336 N.J. Super. at 62 (citing N.J.S.A.

52:27BB-66.1).  The court concluded that through the Supervision Act, the LFB and the Director

were granted a "pantheon of powers . . . to accomplish the obvious intent of the Legislature to

stem fiscal bleeding and administrative ineptness in distressed municipalities." Id.  Kenney

confirms that prior to May 10, 2000, the City had control of its management functions, including

the power to hire and fire and after May 10, 2001, the City lost that control to the LFB through

the Supervision Act.

The Supervision Act specifically provides that the LFB and the Director have authority

over personnel decisions, and Norton Bonaparte, the appointed business administrator, stated that

beginning with his appointment in October 2000, he was an employee of the State and not of the

municipality.  (See  Tr. 121-124).

There is no testimony to the contrary.

This regime continued until the establishment of the "Municipal Rehabilitation and

Economic Recovery Act of 2002", N.J.S.A. 52:27BBB-1, et seq.  This Act changed the City's

organizational structure vis-a-vis liability in tort and contract.  Section 52:27BBB-32 defines the

contours of contract or tort liability for "the chief operating officer or a State officer or employee

involved in the rehabilitation or revitalization of the municipality, as municipal employees."

First, the section immunizes the State from liability "for any action or inaction involving the

rehabilitation or revitalization of the municipality."  Second, the section immunizes the "chief

operating officer, assistant chief operating officer, and any State officer or employee involved in

the rehabilitation or revitalization of the municipality" from liability personally or as State

employees "for any action or inaction involving the rehabilitation or revitalization of the

municipality."  Third, it establishes that "chief operating officer or a State officer or employee

involved in the rehabilitation or revitalization of the municipality" are subject to suit as

municipal employees.

Notably, this statute became effective July 22, 2002, and is applicable retroactive to June

30, 2002.

Thus, the three pieces of legislation read in conjunction result in the following liability pattern in this case:  The City retained control of its personnel decisions and had "final policy-making" authority up until May 10, 2000.  Beginning in May 2000 and up until June 30, 2002, the State in the form of the Local Finance Board of the Department of Community Affairs had control and its agent, Norton Bonaparte, was the final policy-making authority.  Finally, with the enactment of the Municipal Rehabilitation and Economic Recovery Act of 2002, the municipality could be held liable for the acts of the business administrator notwithstanding his official employment with the State.

Left with this information and the trial testimony, the court would be required to find that the City could be held liable for the conduct of its own administrators for acts of discrimination during the period of continuing violation up until May 10, 2000.  Then, the City could not be held liable for the discriminatory employment acts of the LFB during that period beginning with the State's wresting control from the City on May 10, 2000 to the enactment of the MRERA effective June 30, 2002.  Thereafter, the City could again be held liable for the discriminatory acts of the rehabilitation administrators through the trial date.  However, as the court failed to include the relevant statutory scheme in its calculation of municipal liability, the court did not properly advise the jury as to the relevant period of liability.

Further complicating the issue is a very critical fact only disclosed to this court in the City's second supplemental filing following oral argument.  The City states that after the MRERA went into effect, "Mr. Bonaparte lost his job and Mr. Primas was placed, by the State, as the C.O.O. of Camden." (Defs.' Supp. Br. dated 6/9/06 at 9).  The City thus concludes that the MRERA did not apply to Mr. Bonaparte's employment as Business Administrator of the City of

Camden.  (See id.).  The defendants make this argument presumably to highlight the consequent effect that Mr. Bonaparte's termination vitiates City liability based on his conduct.  However, more important to this court is that this heretofore unknown yet highly significant fact illustrates the depth of the court's ignorance of whom to identify as the final policymaker.

The court is responsible for determining the final policymaker and supplying that information to the jury for determination of liability.  The court, bereft of knowledge of either the relevant statutes or the impact they had on the City's governance, did not adequately address the question of City liability.  Moreover, the briefing for this motion illustrates the lack of a factual foundation upon which such a determination can be made.  As a consequence, the court did not properly identify for the jury the final policymaker for purposes of section 1983 liability.  This error led to a finding of liability against the City for conduct during a period in which the City *may* not be responsible.[5]  And the court finds that this error merits a new trial on the question of section 1983 liability for the City.

### b.  Individual Liability

The defendants argue that the individual defendants are entitled to judgment in their favor for claims brought under section 1983.  The defendants' argument relies solely upon the individual defendants' liability in their official capacities.  (See Defs.' Br. at 22-23).  Yet, the plaintiffs brought the claim against the individual defendants in individual capacities.  Thus, the defendants's argument is inapposite.

### c.  Section I of the Jury Interrogatory Sheet

The defendants argue that Section I of the Jury Interrogatory Sheet is fundamentally

---

[5]  The court emphasizes that further factual development is required before a court can definitively address these questions.  This record can be further developed in preparation for the new trial on the question of liability.

flawed because it specifically references only Jury Instruction 18(a) ("Race Discrimination: Elements").  The defendants do not expound on this point.  The court can only posit that the defendants were objecting that the Interrogatory did not specifically refer the jury to each and every charge related to the discrimination claim against the defendants.  However, a full review of the charges reveals  provisions specifically related to municipal liability and defenses.  (See e.g. Instructions 21, 28).  Thus, the court finds no error here.

### 6.  Admission of Testimony Regarding Alleged Acts Prior to August 20, 1999

The defendants rely generally on Shephard v. Hunterdon Developmental Center, 174 N.J. 1 (2002), in support of their renewed motion to bar testimony of continuing violation.  The defendants accurately describe the Lehmann v. Toys R Us standard as restated in Shephard:  that the plaintiffs must show that the complained of conduct (1) would not have occurred but for the employees' protected status, and (2) was severe or pervasive enough to make a (3) reasonable person believe that (4) the conditions of employment have been altered and that the working environment is hostile or abusive.  174 N.J. at 24.  Similarly, the court agrees with the defendants that a supervisor's coldness, lack of civility, rudeness, lack of sensitivity, simple teasing, off-hand comments, and isolated incidents do not constitute discrimination.  (See Defs.' Br. at 25). However, the defendants would have this court reject the jury's consideration of the evidence in favor of the defendants' general assertion that the plaintiffs' testimony did not constitute severe or pervasive conduct.  The defendants cite to the entirety of the plaintiffs' testimony without detail.  In contrast, the plaintiffs parse the testimony and provide an accurate and thorough description of numerous incidents of discrimination over many years.  Moreover, the court reviewed the trial testimony and finds the plaintiffs' factual recitation accurate and the evidence more than adequate to support a finding of liability under the above standard.  Thus, the

defendants' motion on this point is denied.

### 7.  NJLAD Aiding and Abetting by Individuals

The defendants assert first that the plaintiffs did not present evidence to substantiate a claim of aiding and abetting under the NJLAD.  However, the court finds, after review of the evidence, that the plaintiffs met their burden of proof to establish aiding and abetting liability.

Second, the defendants vaguely assert that the court did not supply the correct charge. However, the court's aiding and abetting charge was very specific and included all the information necessary to assist the jury in determining liability of the individual defendants as aiders and abettors under NJLAD.  See Hurley v. Atlantic City Police Dept., 174 F.3d 95, 127 (3d Cir. 1999).

### 8.  Punitive Damages – New Jersey Law Against Discrimination

#### a.  Willful Indifference

The defendants argue that the plaintiffs did not establish that the defendants acted with willful indifference and wanton disregard.  The plaintiffs marshal much evidence and the court has reviewed the testimony and concurs that sufficient evidence exists to support the jury's award.

#### b.  Punitive Damages under NJLAD against the City of Camden – Jury Instruction Regarding Upper Management

The defendants object to the inclusion of Chief Zieniuk in the charge regarding upper management. The defendants did object to the inclusion of Chief Zieniuk as a member of upper management at trial and now argue that Chief Zieniuk should not have been included in that group because he did not have the authority to hire, fire, promote, and discipline the employees. (See Defs.' Br. at 32).  However, that is not the only or even the necessary quality of a member of

upper management.  Rather, as the charge states:

> For an employee on the second tier of management to be considered a member of "upper management," the employee should have *either* (1) broad supervisory powers over the involved employees, including the power to hire, fire, promote and discipline, *or* (2) the delegated responsibility to execute the employer's policies to ensure a safe, productive and discrimination-free workplace.

(Jury Instruction 38E) (emphasis supplied).  It is the jury who has the duty to determine this question, particularly where as here the parties do not agree as to the members of upper management.  See Hurley, 174 F.3d at 124.  The jury so determined.  The court has reviewed the testimony and finds that there is sufficient evidence with which to support that determination and the defendants present no viable argument to the contrary.

### 9.  Garcetti v. Ceballos

At oral argument, the defendants raised for the first time the issue of whether the plaintiffs' First Amendment claims constitute protected speech.  The basis for this untimely assertion was the Supreme Court's recent decision, Garcetti v. Ceballos, __ U.S. __, 126 S. Ct. 1951 (2006), issued on May 30, 2006.  The defendants contend that Garcetti nullifies the First Amendment protection formerly enjoyed by Crowder's and Hailey's conduct.  The defendants identify that conduct as the plaintiffs complaining about safety, overtime, and hiring practices to the fire department, the newspaper, and to City Council.  (See Defs.' Supp. Br., 6/9/06, at 3).  The defendants note that Crowder spoke out against the fire department's policy with respect to overtime, complained concerning the abuse of overtime and the lack of equitable distribution of overtime to members of the fire department, and complained about access to promotions and the Fire Chief test.  (See id. at 3-4).  The defendants summarize Hailey's testimony to include speaking out on disrepair of fire department equipment, overtime, lack of adequate personnel

assigned to the fire department, and safety concerns resulting from these alleged problems, as well as complaining about the department's handling of the <u>Angemi</u> matter.  (<u>See</u> <u>id.</u> at 4-5).  The defendants argue that the plaintiffs made all of these statements pursuant to their official duties.  Thus, the defendants conclude, <u>Garcetti</u> ejects them from the realm of protected speech.

In opposition, the plaintiffs distinguish <u>Garcetti</u>, asserting that the plaintiffs attended City Council meetings and spoke with newspapers as private citizens and not as employees.  The plaintiffs, citing trial testimony, maintain that the plaintiffs spoke out not in their capacities as fire fighters, but as concerned citizens.  The plaintiffs testified that they placed their names on the agenda as any citizen would.  (<u>See</u> Tr. 11/16-18/04 at 66-67).

I have no doubt that many courts will struggle to define the breadth of <u>Garcetti</u> and its impact on First Amendment jurisprudence.  That struggle, however, need not begin with this case as <u>Garcetti</u> is clearly distinguishable.  <u>Garcetti</u> concerned a Los Angeles County district attorney's claim of retaliation based solely on an internal memorandum that he wrote to his superiors.  The Court held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communication from employer discipline."  126 S. Ct. at 1960.  The Court explained "[t]he controlling factor in Ceballos' case is that his expressions were made pursuant to his duties as a calendar deputy. . . . Ceballos wrote his disposition memo because that is part of what he, as a calendar deputy, was employed to do."  <u>Id.</u> at 1959-60.  To further illustrate the point, the court provided a contrasting example:

> Contrast, for example, the expressions made by the speaker in <u>Pickering</u>, whose letter to the newspaper had no official significance and bore similarities to letter submitted by numerous citizens every day.
> Ceballos did not act as a citizen when he went about

> conducting his daily professional activities, such as supervising
> attorneys, investigating charges, and preparing filings.  In the same
> way he did not speak as a citizen by writing a memo that addressed
> the proper disposition of a pending criminal case.  When he went
> to work and performed the tasks he was paid to perform, Ceballos
> acted as a government employee.  The fact that his duties
> sometimes required him to speak or write does not mean his
> supervisors were prohibited from evaluating his performance.

Id. at 1960.  The Court reaffirmed as necessary "informed, vibrant dialogue in a democratic

society" and acknowledged that "costs may arise when dialogue is repressed."  Id. at 1959.

Plaintiffs Hailey and Crowder referenced uncontested testimony that they attended and spoke at

the City Council meetings and to the newspapers as private citizens.  The defendants have

pointed to no testimony even suggesting that attending City Council meetings and speaking with

newspapers was a part of the plaintiffs official duties.  Rather, the testimony confirms that

plaintiffs' speech at the City Council meetings and to the newspaper served to promote the

"public's interest in receiving the well-informed views of government employees engaging in

civic discussion."  Garcetti, 126 S. Ct. at 1958.  Garcetti did not immunize the defendants from

retaliation for the plaintiffs' speech in this case.  The jury found actionable retaliation and this

court need not disturb that finding based on Garcetti.

### C.  Conclusion

For the foregoing reasons, the defendants' motion for a new trial shall be granted in part,

ordering a new trial, in accordance with the above discussion, (1) on the issue of punitive

damages as to all parties and (2) on the section 1983 claim against the City of Camden.  The

question of the final policy maker for purposes of section 1983 liability against the City of

Camden shall be decided by the trial court upon presentation of evidence necessary for that

determination.  As to all other points, the defendants' motion shall be denied.

**IV**.    **Plaintiffs' Motion for Injunctive and Declaratory Relief**

The plaintiffs have moved for injunctive and declaratory relief.  The court shall deny this motion without prejudice pending the outcome of the new trial ordered herein.  However, the court shall make one observation.  The plaintiffs first request that this court order the City to supply the court with proof that it has complied with Section 9(a) of the Consent Decree of May 30, 1980 "from January 1, 2005 and for every sixty days thereafter until such time as the Court deems Camden in compliance." (Proposed Order).  Although the court is not making a finding at this time, the court reflects that the plaintiffs dropped any and all claims under the Consent Decree prior to the commencement of trial.  Thus, if and when the plaintiffs renew their motion following the new trial, the plaintiffs should limit their injunctive relief to that which is properly before the court.

An appropriate order shall enter this date.


/s Joel B. Rosen
JOEL B. ROSEN
United States Magistrate Judge

Dated:  July 5, 2006