IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

---

KEVIN HAILEY and TERRENCE
CROWDER,

               Plaintiffs,

    v.

CITY OF CAMDEN, et al.,

               Defendants.

---

HON. JEROME B. SIMANDLE

Civil No. 01-3967 (JBS/JS)


**<u>OPINION</u>**

APPEARANCES:

Gregg L. Zeff, Esq.
LAW FIRM OF GREGG L. ZEFF
100 Century Parkway
Suite 305
Mt. Laurel, NJ 08054
    Counsel for Plaintiffs Kevin Hailey and Terrence Crowder

Cheryl L. Cooper, Esq.
HOLSTON, MACDONALD, UZDAVINIS & ZIEGLER, PC
66 Euclid Street
P.O. Box 358
Woodbury, NJ 08096
    -and-
Felix P. Gonzalez, Esq.
OFFICE OF THE CAMDEN CITY ATTORNEY
City Hall - 4th Floor - Suite 419
520 Market Street
P.O. Box 95120
Camden, NJ 08101-5120
    Counsel for Defendants City of Camden, Herbert Leary, and
    Joseph Marini

**SIMANDLE**, District Judge:

## I.   INTRODUCTION

The present litigation has a long and tortured history. Instituted in 2001, this case has already endured a three week-long trial tried by consent pursuant to 28 U.S.C. § 636(c) before the Magistrate Judge, a jury verdict in favor of both Plaintiffs, and post-verdict motions practice.  Nonetheless, trial errors and unresolved questions have, thus far, prevented its resolution. With this Opinion, the Court intends to set out a clear path on which this action will proceed, with all due haste, to a final judgment.

The procedural posture of this case is unusual, for the Court is entering the case as a successor to the Magistrate Judge.[1]  Presently before the Court are two relatively minor motions: Defendants' motion to amend its prior motion for judgment notwithstanding the verdict, a new trial, and/or remittitur [Docket Item 163], and Plaintiffs' motion to consolidate this action with Civil Action Number 06-5897(JBS)

---

[1] The case was tried before former U.S. Magistrate Judge Joel B. Rosen, who retired from the bench in September, 2006. Since the case was filed upon the docket of the undersigned, and since the parties did not renew their consent to proceed before the Magistrate Judge following Judge Rosen's retirement, these matters fall to the undersigned as a successor judge.  A successor judge is bound by the law of the case unless clear error of law has been made, Pardini v. Allegheny Intermediate Unit, 524 F.3d 419, 426 (3d Cir. 2008), or unless an intervening change of law has occurred, Beazer East, Inc. v. Mead Corp., 525 F.3d 255, 263 (3d Cir. 2008).

[Docket Item 136].  Of greater interest, however, to the Court and the parties is this Court's interpretation, implementation and (as to one issue) modification of the Magistrate Judge's July 5, 2006 Opinion granting in part and denying in part Defendants' motion for a new trial [Docket Item 126], Hailey v. City of Camden, No. 01-3967, 2006 WL 1875402 (D.N.J. July 5, 2006).

### A.    Plaintiffs' Claims

On August 20, 2001, Plaintiffs Kevin Hailey and Terrence Crowder, two African-Americans officers with the City of Camden Department of Fire (Hailey was then a provisional Deputy Chief and Crowder was a Battalion Chief), brought suit against the City of Camden, former Fire Chief Herbert Leary, and present Fire Chief Joseph Marini (collectively, "Defendants").[2]  Plaintiffs alleged that Defendants failed to promote them (and manipulated the promotional process) on the basis of race and created a hostile work environment on the basis of race in violation of Sections 1981 and 1983 of the Civil Rights Act of 1871, 42 U.S.C. §§ 1981, 1983, and the New Jersey Law Against Discrimination ("NJLAD"), N.J. Stat. Ann. §§ 10:5-1 to -49.  Plaintiffs further alleged that Defendants retaliated against them when they publically complained of Fire Department procedure in violation

---

[2] Plaintiffs also sued former Mayor Milton Milan and former City Attorney John Misci, but subsequently voluntarily dismissed all claims against both men.

3

of Section 1983 and NJLAD.[3]  They sought compensatory and
punitive damages, or in the alternative, nominal damages.

    **B.    Trial and Verdict**

    All parties consented to have the case tried by the
Magistrate Judge and it proceeded to trial on November 10, 2004.
Following a three-week trial, the jury returned a verdict in
favor of both Hailey and Crowder against all Defendants, awarding
compensatory damages for lost wages, nominal damages for other
injuries (except for the NJLAD hostile work environment claims,
for which both Plaintiffs were awarded compensatory damages
beyond lost wages), and punitive damages against the City of
Camden only.

    Specifically, the jury found in favor of both Plaintiffs
against all Defendants on their race discrimination claims under
Sections 1981 and 1983, awarding Crowder $116,000 and Hailey
$70,000 in lost wages, and both $1 for all other losses.  The
jury found in favor of both Plaintiffs against the individual
defendants Leary and Marini for their federal First Amendment
claims, indicating "SEE ABOVE" for each on lost wages
(referencing the amount under the federal race discrimination
claims), and awarding them each $1 for all other losses.  With
regards to the NJLAD race discrimination claims, the jury found

---

    [3] Plaintiffs also alleged, but later voluntarily dismissed,
violations of Title VII of the Civil Rights Act of 1964.

against all Defendants and awarded lost wages to each plaintiff
(again by indicating "SEE ABOVE") against each defendant and $1
for all other losses.  The jury likewise found against all
Defendants on Plaintiffs' NJLAD hostile work environment claims,
similarly awarding the same amount ("SEE ABOVE") of lost wages to
each plaintiff against each defendant.  In addition, the jury
awarded Crowder $50,000 against the City of Camden, $30,000
against Leary, and $20,000 against Marini for other losses under
his NJLAD hostile work environment claim.  The jury awarded
Hailey $50,000 against the City of Camden, $20,000 against Leary,
and $30,000 against Marini for other losses on his NJLAD hostile
work environment claim.  Finally, the jury determined that the
City of Camden should pay Crowder $350,000 and Hailey $300,000 in
punitive damages without distinguishing between federal and state
claims, but did not award the Plaintiffs punitive damages from
the individual defendants.

### C.   Defendants' Prior Motion for Judgment Notwithstanding the Verdict or for New Trial

Defendants then filed a motion for judgment notwithstanding
the verdict or new trial (and/or remittitur).  On July 5, 2006,
after extensive briefing, the Magistrate Judge issued an opinion
granting in part and denying in part Defendants' motion for a new
trial (and denying the motion for JNOV and remittitur).  The
Court will discuss that opinion at greater length below, but the
impact of the opinion is as follows:

- The verdict on liability and damages under Section 1983 for First Amendment violations against Defendants Leary and Marini in their individual capacities stands.

- The verdict on liability and compensatory damages under NJLAD stands against all Defendants.

- The verdict on liability under Sections 1981 and 1983 for racial discrimination (failure to promote and hostile work environment) against Defendants Leary and Marini in their individual capacities stands.[4]

- Punitive damages under NJLAD and Sections 1981 and 1983 against all Defendants must be retried.

- The question of municipal liability for the City of Camden under Sections 1981[5] and 1983 for racial discrimination must be retried.

The Magistrate Judge later denied Defendants' motion to reconsider, and thus his July 5, 2006 Opinion is currently the law of the case.

### D.   Summary of Present Opinion

As to the outstanding issues in this case, the Court will deny Defendants' motion to amend as well as Plaintiffs' motion to consolidate, and will alter the Magistrate Judge's July 5, 2006 Opinion only in that the Court will set forth a somewhat different legal framework to guide the new trial as to municipal

---

[4] Though not directly addressed by the Magistrate Judge (or by the parties), the jury entered verdicts against both Leary and Marini for "racial discrimination" under Sections 1981 and 1983 and the Magistrate Judge's opinion does not disturb this result, and thus the Court finds that this verdict remains.

[5] The Magistrate Judge did not address Plaintiffs' claims under Section 1981, but the verdict sheet (and jury instructions) do not distinguish between these two claims under Sections 1981 and 1983.

liability (and will reject any reading of the Magistrate Judge's Opinion that would permit reopening the record regarding the final policymaker).  The Court will further make clear that Plaintiffs' awards for lost wages for their NJLAD and federal First Amendment claims are unaltered by this, or the Magistrate Judge's, opinions.  As a consequence, Plaintiffs retain their verdicts against the individual defendants on their federal race discrimination claims and their First Amendment claims, as well as their verdicts against all Defendants on both NJLAD claims, except that punitive damages under NJLAD must be retried as to all Defendants.[6]  Plaintiffs may, if they choose, pursue their federal race discrimination claims arising under Sections 1981 and 1983 against the City of Camden in a new trial.

## II.  BACKGROUND

### A.   Facts Presented at Trial

The evidence presented at the lengthy trial was substantial, and will be presented in the light most favorable to Plaintiffs as to the claims on which they prevailed.  Furthermore, for the purpose of this opinion, given the lengthy record in this case, the Court will focus on the evidence of racial discrimination,

---

[6] The Magistrate Judge, as will be discussed below, determined that because of confusing jury instructions the jury might have subsumed the individuals' punitive liability in the City's punitive liability and so Plaintiffs were entitled to a new trial on punitive damages against the individual defendants, despite the first verdict awarding them no punitive damages from Marini or Leary.  Hailey, 2006 WL 1875402, at *7.

rather than retaliation.

### 1.   Plaintiff Kevin Hailey

Kevin Hailey arrived at the Fire Department in 1982, when the Department was 20 to 30 percent minority firefighters, but had no black battalion chiefs, no black deputies, and a white Fire Chief. Hailey was the first and only minority at his fire station, and he was aware of several other stations that had no minority firefighters at all. During those early years he was subjected to regular discrimination based on his race: he could only sleep in certain beds, his fellow firefighters ignored him and wouldn't eat the donuts he brought in, and he was subjected to racial epithets such as "nigger." During the six years he was a junior firefighter he heard a regular stream of racial epithets about "niggers," "spics," "kikes," and "black hoes," among others. While a new firefighter, Hailey was often (three out of ten fires) abandoned by his captain and left alone to fight fires. He observed that African-American homes were treated differently than Caucasian homes when they fought fires. The firefighters were told by officers to take off their shoes in white homes, but never in minority homes.

In 1989, Hailey became a captain, after placing seventh out of 146 takers of the test for captain. Hailey hoped that as a captain, he would finally earn the respect of his fellow firefighters. He did not get it. Other firefighters claimed

that the exam must have been subject to a curve to benefit
minorities and referred to it as "Hailey's Comet" (started at the
bottom and shot to the top).  He heard comments like, "there is
no way this nigger beat me on the test."  Hailey, unlike the
other white captains, was closely watched and criticized in front
of his men by his Deputy Chief.

In 1992, Hailey became a battalion chief after finishing
second on a test of fifty or sixty people.  He remained a
battalion chief until 2002.  By 1992, there were more minorities
in the Department, with five out of fifty-six captains being
minority.  Even as a battalion chief, the firefighters did not
respect him, and half of his orders at fire scenes were not
followed.  He went to his Deputy Chief with these acts of
insubordination, but nothing happened to the firefighters who
disobeyed him.  At management meetings, where until 1996 Hailey
was the only minority officer present, the other officers ignored
his comments.  In 1996, Terrence Crowder became battalion chief,
and then the other officers disrespected both Hailey and Crowder.

Over the years, Hailey observed a pattern of disciplining
minority firefighters more severely and more often than white
firefighters.  For example, in Hailey's experience, when a
minority firefighter or officer (of any rank) was arrested, he
would be immediately suspended.  However, when George White, a
white firefighter, was arrested, he continued to work until the

Brotherhood of United Firefighters ("BUFF"), a black firefighters association, intervened and highlighted the disparate treatment.

Hailey had contact with both Fire Chief Leary and his successor, Fire Chief Marini.  During the years Leary was Fire Chief (from the middle of 1998 to the end of 1999), Hailey made complaints about insubordination to him through Hailey's Deputy Chief, and no action was taken.  In 1998 or 1999, Hailey heard Leary say to Crowder: "I am better than any ten of you fucking black guys."  Prior to becoming Fire Chief, Leary was Fire Marshal.  At some point in the middle of the 1990s, Hailey heard Leary say, "I can't trust those mulattos."  He also heard Leary make derogatory comments about black women, calling them "black whores."  After Marini became Fire Chief in January, 2000, Hailey heard him call a Jewish official a "Jew bitch" and refer to "Heeb lawyers" and "Guiney bastard."

In April, 2002, Hailey became a deputy chief, but he has little power and his recommendations are never followed.  His orders are still not being followed.  At a fire in Gloucester City in 2002, two white battalion chiefs attempted to relieve him of his command at the scene.  Hailey reported this conduct to Marini, but nothing was done.  For a period Hailey became Fire Chief, while Marini was injured, but every time he spoke at a City administrative meeting, the current Business Administrator would shout him down.

2.   Plaintiff Terrence Crowder

Terrence Crowder, who joined the Fire Department in June, 1983, experienced much of what Hailey experienced during his term as a junior firefighter.  When he first began, Crowder believes his fellow firefighters did not know he was African American and made lots of racist jokes in front of him, until they learned he was African American, at which point he was transferred to East Camden in 1984.  In East Camden, there was a room called the "black room" where only black firefighters slept.  Crowder, like Hailey, was left alone at fire scenes four or five times.  Each time he complained to a superior, and there was no consequence. In 1996, Captain Jimmy Alexander told Crowder, "nigger, mop the floor," but as a result Crowder was charged with insubordination and conduct unbecoming a fire fighter.

From 1994 to 1996, Crowder worked in the Fire Marshal's office.  In February, 1996, he became a captain.  After becoming a captain, Leary, who at the time was Fire Marshal, transferred him back to the suppression line and brought in two white captains to fill his spot.  Once back on the line, Crowder was given only two, aging, firefighters instead of a full platoon of three.  Crowder complained to his Deputy Chief, but never received an answer.  Even after Crowder became a battalion chief in 1998, at almost every job a subordinate would question his orders or refuse to report to him at fire scenes.  In July, 1999,

11

Crowder saw a picture of two Hispanic women posted on the bulletin board, with a handwritten note on the bottom calling the women "Grandma Barrios" and "Grandma Figeroa" and saying "Run down to Taco Bell."

Crowder had direct contact with Marini, both before and after Marini became Fire Chief.  While Marini was still a battalion chief and assistant to the Fire Chief, Marini screamed at Crowder for not giving a fire report (while Crowder knows that another captain never gave a report on a national fire scene and was never yelled at).  After Crowder became a battalion chief and Marini became Fire Chief, he heard Marini referring to people as "Jew bitch" and "Heeb lawyer."  In a series of memoranda, Crowder, as a member of the Executive Board of BUFF, complained to Fire Chief Marini about the conduct of Deputy Chief Zieniuk.  Crowder complained that Zienuik was discriminating against two minority captains and that Zienuik was mistreating him.  Crowder was not informed of any investigation into these matters.  When he spoke directly to Marini about Zieniuk, Marini agreed that Zieniuk was acting unprofessionally, but said that he had a problem with Crowder raising the issue of race.

Crowder also had significant contact with Leary.  While Crowder was working in the Fire Marshal's office from 1994 to 1996, Leary was the Fire Marshal.  Leary would regularly brag about his exploits with black women (and only black women) and

frequently used the term "black hoe."  Leary used epithets "wop,"
"spic," and "nigger" (though these were never directed at
Crowder).  Crowder complained about these comments to his Deputy
Chief, but nothing happened.  Once Crowder became a captain in
1996, it was Leary's decision to transfer him back to the line.
On November 7, 1997, Leary told Crowder, "I'm a better fucking
man than all of your black guys," and told two other black
firefighters, "I'm a better fucking man than all of you guys."
On June 16, 1998, after Leary became Fire Chief and Crowder was a
battalion chief in the training academy, Leary called Crowder
into his office and told Crowder that he was going to curtail
Crowder's powers, which included limiting Crowder's opportunities
to get overtime.  After Crowder transferred back to the
suppression line, two white officers were given Crowder's duties
at the training academy and received significant overtime.  In
response to Leary's treatment, Crowder filed a complaint with the
EEOC (which settled without his knowledge) and the New Jersey
Division of Civil Rights.  He filed another EEOC complaint after
Leary screamed at him for requesting keys to the fire
administrative offices (at the time, Crowder was in charge of
fire administration).

     3.   <u>Failure to Promote</u>

    Both Crowder and Hailey were denied opportunities for
advancement based upon their race.  First, in October, 1999, they

were not permitted to sit for the Fire Chief examination, while
two white officers were permitted to sit for the exam, which at
that time was administered by Marjorie Schwartz, Director of
Human Resources Management for the New Jersey Department of
Personnel.  Leary and Marini, six or eight weeks before the
position of Fire Chief was posted (and thus before Crowder or
Hailey learned of the opportunity), prepared a letter in support
of Battalion Chief Thomas Quinn's qualifications to take the
exam.  Ultimately, Quinn and Marini, both white, were permitted
to sit for the exam, while Hailey (who was no less qualified) was
not.

Second, at some point in 2000, Hailey and Crowder were
denied positions as provisional deputy chiefs, when two less-
qualified white males were appointed.  At the time, two
provisional deputy chief positions opened and six people took the
necessary test.  Hailey was ranked first and Crowder was ranked
forth, yet Zieniuk (ranked fifth) and Quinn (ranked second)
received the positions.  Only after Hailey filed an EEOC
complaint was Zienuik demoted and Hailey received a provisional
deputy chief position.

Third, in August, 2001, Crowder was denied a position as a
permanent deputy chief.  Norton Bonaparte, the Business
Administrator for Camden, appointed a white officer with less
seniority than Crowder.  Though Hailey did receive the position,

he was paid less than the other deputy chiefs.  Crowder filed a
grievance in response.

###### B.    Jury Instructions, Interrogatories and Objections

Following the three-week trial the Magistrate Judge provided
the jury with fifty-seven pages of jury instructions along with
interrogatories, both without objection from any party.  There
were, however, significant flaws in those instructions.  First,
instruction number 37 told jurors they could award punitive
damages under 42 U.S.C. §§ 1981 and 1983 "against any or all of
the defendants," when punitive damages are unavailable against a
municipality under these federal statutes.  The jury
interrogatory for punitive damages does not distinguish between
the federal and state claims and directs the jury, when
evaluating punitive damages against the City, to look to
instruction 37 (federal civil rights punitive damages), as well
as instruction 38 (NJLAD punitive damages).  Second, the
Magistrate Judge never instructed the jury as to who they should
consider to be the final policymaker on Plaintiffs' failure to
promote or hostile work environment claims for purposes of
municipal liability under Sections 1981 and 1983, thus putting
the verdict against the City of Camden under these federal
statutes into doubt.  Significantly, however, none of the parties
objected to these instructions as given.

15

### C.    Motion for JNOV, New Trial, and/or Remittitur

After trial, Defendants hired new counsel and filed a renewed motion for judgment notwithstanding a verdict or, in the alternative, a new trial.  In that motion, Defendants raised the following arguments:

(1)  <u>Punitive Damages</u>: The jury was incorrectly instructed that it could award punitive damages against the City of Camden under the federal statutes and the jury verdict sheet on punitive damages does not distinguish between NJLAD and the federal statutes, thus a new trial on punitive damages is necessary.

(2)  <u>Nominal Damages</u>: The jury was incorrectly instructed that it could award nominal damages against Defendants under the federal statutes, even where Plaintiffs failed to prove damages.

(3)  <u>Wage Loss</u>: The jury verdict as to wage loss for both Plaintiffs was against the weight of the evidence.

(4)  <u>Evidence of Discrimination After Complaint Filed</u>: Plaintiffs did not allege continuing violations and so evidence of discrimination after August 20, 2001 (when the complaint was filed) should not have been admitted.

(5)  <u>Municipal Liability under Sections 1981 and 1983</u>: Plaintiffs failed to show municipal liability because they did not establish who was the final policymaker with respect to employment decisions.  Norton Bonaparte, the alleged policy maker, was an agent of the State of New Jersey, and not Camden, and thus Camden cannot be held liable for his actions under Section 1983.

(6)  <u>Section I of Jury Interrogatory</u>: Section I of the jury interrogatory on racial discrimination under the federal statutes was flawed because it guided jurors to jury instruction 18(a), which did not properly instruct jurors on the federal charges.

(7)  <u>Evidence of Discrimination Prior to August 20, 1999</u>: Plaintiffs failed to establish that they suffered a hostile work environment, and so evidence of

discrimination before the statute of limitations period should not have been admitted.

(8) <u>Aiding and Abetting under NJLAD</u>: The jury verdict finding that Leary and Marini aided and abetted in discrimination was against the weight of the evidence. The jury instruction on aiding and abetting was incorrect.

(9) <u>Punitive Damages under NJLAD</u>: A jury verdict of punitive damages under NJLAD (assuming it was possible to separate NJLAD from the federal statutes on the verdict sheet) was against the weight of the evidence. Further, the jury instruction on "upper management" was incorrect.

(10) <u>First Amendment Protected Speech</u>: Under <u>Garcetti v. Ceballos</u>, 547 U.S. 410 (2006), Plaintiffs' speech was not protected because they spoke pursuant to their official duties.

**D.   The Magistrate Judge's July 5, 2006 Opinion**

In his July 5, 2006 Opinion, the Magistrate Judge rejected all but two of Defendants' arguments.  The Magistrate Judge found that the jury was incorrectly instructed that they could award punitive damages against the City of Camden under Section 1983 and that the jury verdict form did not distinguish between the federal and state claims, such that a new trial was necessary on punitive damages against the City of Camden.  The Magistrate Judge agreed with Plaintiffs that because the jury interrogatory "directed the jury to consider punitive damages against the City as a result of the individual defendants' First Amendment violations" the jury might have "subsumed the individual [defendants'] punitive liability in the City's punitive

17

liability." Thus a new trial was necessary on punitive damages for all Defendants.

The Magistrate Judge also concluded a new trial was necessary on the question of Section 1983 liability for the City of Camden, because he did not instruct the jury on who was the final policymaker regarding employment decisions for purposes of municipal liability. The Magistrate Judge noted that both Plaintiffs and Defendants identified Norton Bonaparte, Camden's Business Administrator, as the final policymaker with respect to employment decisions at the relevant time. The Magistrate Judge further noted that Mr. Bonaparte testified, without contradiction, that he was employed by the State of New Jersey. Nevertheless, the Judge went on to outline the history of New Jersey oversight of Camden's affairs and looked to the City's present tort liability for State officers under Municipal Rehabilitation and Economic Recovery Act of 2002 ("MRERA") to conclude:

> Left with this information and the trial testimony, the court would be required to find that the City could be held liable for the conduct of its own administrators for actions of discrimination during the period of continuing violation up until May 10, 2000. Then, the City could not be held liable for the discriminatory employment acts of the LFB during that period beginning with the State's wresting control from the City on May 10, 2000 to the enactment of the MRERA effective June 30, 2002. Thereafter, the City could have be held liable for the discriminatory acts of rehabilitation administrators through the trial date.

<u>Hailey</u>, 2006 WL 1875402, at *13.

The Judge, however, concluded that there was a "lack of factual foundation" for the determination of who the final policymaker was for the purposes of Section 1983 liability.  The Judge explained in a footnote: "The court emphasizes that further factual development is required before a court can definitively address these questions."  This concern seems to arise from Defendants' argument that MRERA does not apply to this analysis because Mr. Bonaparte lost his position as Business Administrator with MRERA's enactment (a fact that the Magistrate Judge believed was only introduced during oral argument on Defendants' post-trial motion).  The Magistrate Judge ultimately concluded: "As a consequence [of this paucity of facts], the court did not properly identify for the jury the final policymaker for purposes of section 1983 liability.  And the court finds that this error merits a new trial on the question of section 1983 liability for the City."  <u>Id.</u>

The Magistrate Judge did not explicitly address in his July 5th Opinion, nor his denial of reconsideration, Defendants' contention that the award of lost wages is inextricably linked to both the federal and state claims such that a new trial is warranted on compensatory damages as well.  Nevertheless, he made clear that only municipal liability under the federal statutes and punitive damages were to be retried.  The question remains as

to what impact, if any, a retrial as to punitive damages and municipal liability will have on Plaintiffs' award for lost wages under NJLAD.

    **E.**   **New Motions**

        1.   <u>Motion to Amend Motion for JNOV or New Trial</u>

On January 5, 2009, Defendants filed an amendment to their original motion for judgment notwithstanding the verdict or new trial.  In the alternative, they seek relief from judgment under Rule 60(b)(6), Fed. R. Civ. P.  In that motion Defendants argue, for the first time, that the trial court erred in charging the jury on aiding and abetting under NJLAD because the allegation was not pled nor contained in the joint pre-trial order.

        2.   <u>Motion to Consolidate</u>

On March 13, 2007, Plaintiffs moved to consolidate this action with Civil Action Number 06-5897, which is Plaintiffs' second suit against the City of Camden for continuing racial discrimination and retaliation.  Defendants oppose consolidation.

**III. DISCUSSION**

    **A.**   **Municipal Liability and Reconsideration of the July 5, 2006 Opinion**

There is no motion presently before the Court regarding municipal liability and whether it was sufficiently established at trial to permit the jury's verdict against the City under

Sections 1981 and 1983 to stand.[7]  The Magistrate Judge's Opinion on the subject and his Order mandating a new trial to establish the City's liability under Section 1983 is the law of the case. Nevertheless, as the successor Judge, the Court has inherent power to modify or vacate its own interlocutory orders.  Fed. R. Civ. P. 54(b) ("[A]ny order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all of the parties' rights and liabilities."); John Simmons Co. v. Grier Bros. Co., 258 U.S. 82, 88 (1922) ("[T]he court at any time before final decree may modify or rescind [interlocutory orders]."); United States v. Jerry, 487 F.2d 600, 605 (3d Cir. 1973). "[S]o long as the district court has jurisdiction over the case, it possesses inherent power over interlocutory orders, and can reconsider them when it is consonant with justice to do so."  Jerry, 487 F.2d at 605.

The Court will exercise this authority and reexamine the July 5, 2006 Opinion in this case.  In doing so, the Court applies a somewhat different analysis to the question of

---

[7] The Court previously gave written notice of its intention to reexamine this issue and heard argument and permitted supplemental briefing, thus affording all parties the opportunity to be heard.

municipal liability, and the nature of the final policymaker, raised in this case.  Looking at the record through this lens, the Court concludes that the Magistrate Judge correctly found that a new trial was necessary to establish municipal liability. The difficulty in correctly identifying the necessary policymaker and determining his or her relationship with the City and the State, however, is not the product of any deficiency in the record, but instead is the result of confusion on the part of all parties as to the governing law.[8]

       1.  <u>Standard of Review</u>

As the successor Judge, rather than a court sitting on appeal, this Court is bound by the same standard of review as any trial court.  A court may grant judgment as a matter of law pursuant to Rule 50(a), Fed. R. Civ. P., where there is no "legally sufficient evidentiary basis" for a reasonable jury to find in favor of the non-moving party.  In considering a motion for judgment as a matter of law, the Court must determine "whether, viewing the evidence in the light most favorable to the verdict, a reasonable jury could have found for the prevailing

---

[8] The Court finds, after reviewing the record and the arguments made by both parties, that all other aspects of the July 5, 2006 Opinion will remain the law of the case and can be challenged on appeal to the Third Circuit after a final judgment is entered as to all claims and parties.  The Magistrate Judge, as the trial judge, was in a better position to address the majority of Defendants' arguments pertaining to sufficiency of the evidence and procedural developments at trial.

party."  Johnson v. Campbell, 332 F.3d 199, 204 (3d Cir. 2003).

> Although judgment as a matter of law should be
> granted sparingly, we will grant it where "the
> record is critically deficient of the minimum
> quantum of evidence" in support of the verdict.
> Gomez v. Allegheny Health Servs., Inc., 71 F.3d
> 1079, 1083 (3d Cir. 1995).  "The question is not
> whether there is literally no evidence supporting
> the unsuccessful party, but whether there is
> evidence upon which a reasonable jury could
> properly have found its verdict."  Id. (citation
> omitted).   Furthermore,  "[i]n performing this
> narrow inquiry, we must refrain from weighing the
> evidence, determining the credibility of witnesses,
> or substituting our own version of the facts for
> that of the jury."  Marra v. Phila. Hous. Auth.,
> 497 F.3d 286, 300 (3d Cir. 2007).

Eshelman v. Agere Systems, Inc., 554 F.3d 426, 433 (3d Cir.
2009).

     The trial court has more flexibility in granting a motion
for new trial and may do so "after a jury trial, for any reason
for which a new trial has heretofore been granted in an action at
law in federal court."  Fed. R. Civ. P. 59(a)(1)(A).  The
decision to grant a new trial based on trial court errors is
limited only by the principle that such errors must not be
harmless -- that is, a court may not grant a new trial based on
"errors and defects that do not affect any party's substantial
rights."  Fed. R. Civ. P. 61.  Where the motion for a new trial
is based on insufficiency of the evidence, however, a new trial
is properly granted only if "a miscarriage of justice" would
occur if the jury's verdict were to stand.  Williamson v.
Consolidated Rail Corp., 926 F.2d 1344, 1353 (3d Cir. 1991).

Moreover, where, as here, Defendants failed to object to the jury instructions (which did not identify the policymaker for the jury), the Court reviews for "plain error in the instructions affecting substantial rights." Fed. R. Civ. P. 51(d)(2); Franklin Prescriptions, Inc. v. New York Times Co., 424 F.3d 336, 339 (3d Cir. 2005). The Court will discard the jury verdict "only where a plain error was 'fundamental and highly prejudicial, such that the instructions failed to provide the jury with adequate guidance and . . . refusal to consider the issue would result in a miscarriage of justice.'" Franklin Prescriptions, 424 F.3d at 339 (quoting Ryder v. Westinghouse Elec. Corp., 128 F.3d 128, 136 (3d Cir. 1997)).

2. Municipal Liability and the Final Policymaker

It is evident that a discussion of municipal liability under Sections 1981 and 1983 and the role of the final policymaker is warranted. It is by now well-established that municipal liability under Section 1983 "may not be proven under the respondeat superior doctrine, but must be founded upon evidence that the government unit itself supported a violation of constitutional rights." Bielevicz v. Dubinon, 915 F.2d 845, 850 (3d Cir. 1990) (citing Monell v. New York City Dep't of Soc. Servs., 436 U.S. 658 (1978)). Similarly, a municipality may not be held vicariously liable for violations of Section 1981 by its employees. McGovern v. City of Philadelphia, 554 F.3d 114, 121

24

(3d Cir. 2009) (citing <u>Jett v. Dallas Indep. Sch. Dist.</u>, 491 U.S. 701, 735-36 (1989)).[9]  As a consequence, a municipality is liable under Sections 1981 and 1983 only when "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." <u>Monell</u>, 436 U.S. at 694; <u>Pembaur v. City of Cincinnati</u>, 475 U.S. 469, 483 (1986) (plurality opinion) ("[M]unicipal liability under § 1983 attaches where -- and only where -- a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question.")

The Third Circuit has neatly defined "policy" and "custom" for the purposes of municipal liability.

> A policy is made "when a decisionmaker possess[ing] final authority to establish municipal policy with respect to the action issues a final proclamation, policy or edict." <u>Kneipp v. Tedder</u>, 95 F.3d 1199, 1212 (3d Cir.1996) (quoting <u>Pembaur v. City of Cincinnati</u>, 475 U.S. 469, 481 [] (1986) (plurality opinion)). A custom is an act "that has not been formally approved by an appropriate decisionmaker," but that is "so widespread as to have the force of law." [<u>Bd. of County Comm'rs of Bryan County v. Brown</u>, 520 U.S. 397, 404 (1997)].

---

[9] In <u>McGovern</u>, the Third Circuit further held that amendments to Section 1981 in the Civil Rights Act of 1991 did not supersede the Supreme Court's opinion in <u>Jett</u> to create an implied private right of action against state actors beyond that provided by Section 1983.  554 F.3d at 117-21.  This decision has little impact on the present case, however, for Plaintiffs brought their federal claims under both provisions.

Natale v. Camden County Correctional Facility, 318 F.3d 575, 584

(3d Cir. 2003).  Both must be tied to the responsible

municipality.

> There are three situations where acts of a
> government employee may be deemed to be the result
> of a policy or custom of the governmental entity
> for whom the employee works, thereby rendering the
> entity liable under § 1983.  The first is where the
> appropriate officer or entity promulgates a
> generally applicable statement of policy and the
> subsequent act complained of is simply an
> implementation of that policy.  The second occurs
> where no rule has been announced as policy but
> federal law has been violated by an act of the
> policymaker itself.  Finally, a policy or custom
> may also exist where the policymaker has failed to
> act affirmatively at all, though the need to take
> some action to control the agents of the government
> is so obvious, and the inadequacy of existing
> practice so likely to result in the violation of
> constitutional rights, that the policymaker can
> reasonably be said to have been deliberately
> indifferent to the need.

Id. (internal punctuation and citations omitted).  Whether a

policy or a custom, "it is incumbent upon a plaintiff to show

that a policymaker is responsible either for the policy or,

through acquiescence, for the custom."  Andrews v. City of

Philadelphia, 895 F.2d 1469, 1480 (3d Cir. 1990).

        "In order to ascertain if an official has final

policy-making authority, and can thus bind the municipality by

his conduct, a court must determine (1) whether, as a matter of

state law, the official is responsible for making policy in the

particular area of municipal business in question, and (2)

whether the official's authority to make policy in that area is

26

final and unreviewable." Hill v. Borough of Kutztown, 455 F.3d
225, 245 (3d Cir. 2006) (internal citations omitted). The
question is one of state law. City of St. Louis v. Praprotnik,
485 U.S. 112, 124 (1988); Andrews, 895 F.2d at 1481. The Supreme
Court has stated:

> [T]he identification of policymaking officials is
> not a question of federal law, and it is not a
> question of fact in the usual sense. The States
> have extremely wide latitude in determining the
> form that local government takes and local
> preferences have led to a profusion of distinct
> forms. . . . Without attempting to canvass the
> numberless factual scenarios that may come to light
> in litigation, we can be confident that state law
> (which may include valid local ordinances and
> regulations) will always direct a court to some
> official or body that has the responsibility for
> making law or setting policy in any given area of a
> local government's business.

Praprotnik, 485 U.S. at 124-25. Where a plaintiff seeks to hold
a municipality liable for a particular policy, the court is
obligated to identify the policymaker for the jury. Jett, 491
U.S. at 737. The Supreme Court has explained, "As with other
questions of state law relevant to the application of federal
law, the identification of those officials whose decisions
represent the official policy of the local governmental unit is
itself a legal question to be resolved by the trial judge before
the case is submitted to the jury." Id. (emphasis in original).

   The analysis is somewhat different, however, where the
plaintiff is able to establish a custom. In that circumstance,
the responsible decision-maker need not be specifically

identified by the plaintiff's evidence.  Kneipp, 95 F.3d at 1213;
Bielevicz, 915 F.2d at 850; see Natale, 318 F.3d at 584 (finding
an unconstitutional practice so pervasive that it could be
attributed to the municipality, without identifying a particular
policymaker responsible for acquiescing in the practice).  Thus,
though policymakers must know of, and acquiesce in, an illegal
custom, knowledge need not be established by direct evidence and
can be inferred from the pervasive nature of the custom.
"Practices 'so permanent and well settled' as to have 'the force
of law' are ascribable to municipal decisionmakers."  Bielevicz,
915 F.2d at 850 (quoting Anela v. City of Wildwood, 790 F.2d
1063, 1067 (3d Cir. 1986)); see Beck v. City of Pittsburgh, 89
F.3d 966, 973 (3d Cir. 1996) (plaintiffs' claims entitled to
reach jury where evidence showed Chief of Police knew "or should
have know" of officer's violent behavior).

The contrapositive of municipal liability analysis is that a
municipality cannot be held liable under Sections 1981 and 1983
for officials acting as state, rather than municipal,
policymakers.  McMillian v. Monroe County, Ala., 520 U.S. 781,
793 (1997).

> This is not to say that state law can answer the
> question for us by, for example, simply labeling as
> a state official an official who clearly makes
> county policy.  But our understanding of the actual
> function of a governmental official, in a
> particular area, will necessarily be dependent on
> the definition of the official's functions under
> relevant state law.

28

Id. at 786.  The key question is whether the State, rather than the municipality, controlled the official when he was performing the particular function that is alleged to have resulted in an injury under Sections 1981 and 1983.  Huminski v. Corsones, 396 F.3d 53, 70-71 (2d Cir. 2005); Grech v. Clayton County, Ga., 335 F.3d 1326, 1330-31 (11th Cir. 2003); Cortez v. County of Los Angeles, 294 F.3d 1186, 1189 (9th Cir. 2002) (citing McMillian, 520 U.S. at 790-91).

There can be no doubt that the trial court erred by failing to identify for the jury the final policymaker for the purpose, at least, of Plaintiffs' failure to promote claim.  See Jett, 491 U.S. at 737 (court required to the identify final policymaker, as a matter of law, before case goes to jury).  Furthermore, that error was plain, for as a result the trial judge failed to give the jury adequate guidance and affected the substantial rights of the City (without a properly identified policymaker, the City could not be held liable for Plaintiffs' federal claims).  See Franklin Prescriptions, 424 F.3d at 339.  It is then necessary for the Court to determine what impact that error should have on the jury verdict and the future of this litigation.  Fed. R. Civ. P. 61.

3.   Policymaker Analysis for Failure to Promote Claim

The Court, in looking at the policymaker question, will employ a somewhat different method of analysis than that used by

29

the Magistrate Judge.  The Court finds, after reviewing the extensive record developed in this case, that while reopening the record following the jury's verdict would not be appropriate, the difficulty in identifying the policymaker (and his or her role as a state or municipal actor) for Plaintiffs' failure to promote claims results not from a paucity of evidence but from confusion on the part of all parties regarding the governing law.  It is this confusion that necessitates a new trial.

Both Plaintiffs and Defendants offer Norton Bonaparte, as the Business Administrator for Camden, as the final policymaker for the City on employment matters.  Plaintiffs argued that "[a]s the final authority, [Mr. Bonaparte] allowed Marini to delay Plaintiffs' promotions and permitted Plaintiffs' job duties to be diminished in violation of NJLAD and the City's own policy." (Pl. Br. Opp'n at 71.)  Defendants agree that Mr. Bonaparte was responsible, but argue that the City cannot be held liable for his conduct because he was a State of New Jersey employee over whom they had no control.  As previously discussed, the final policymaking official must be considered to be acting as a municipal official rather than a state official in order for municipal liability to attach.  McMillian, 520 U.S. at 793. Rather than look to labeling, the key question is whether the State, rather than the municipality, controlled the official when he was performing the particular function that is alleged to have

resulted in an injury under Sections 1981 and 1983.  McMillian, 520 U.S. at 790-93; Huminski, 396 F.3d at 70-71; Grech, 335 F.3d at 1330-31; Cortez, 294 F.3d at 1189.

The Court takes guidance from the Supreme Court's opinion in McMillian.  In McMillian, a man whose criminal conviction was overturned because of State misconduct after six years in prison brought suit against Monroe County in Alabama based on the conduct of the county's Sheriff.  520 U.S. at 783-84.  The Supreme Court ultimately concluded that "Alabama sheriffs, when executing their law enforcement duties, represent the State of Alabama, not their counties."  Id. at 793.  To come to this conclusion, the Supreme Court turned to Alabama law and found the following significant: Alabama's constitution includes sheriffs as part of the executive branch of the state government; Alabama's Supreme Court looked at the history of sheriffs in the state and concluded that they were considered to be executive officers of the state; and the Alabama Code provides sheriffs with the authority to enforce state criminal law, while the counties have no law enforcement power and so cannot control the sheriff's performance in enforcing criminal law (while the Governor and the attorney general do have this kind of control).  Id. at 787-91.  Though the Supreme Court recognized that there were aspects of Alabama law that weighed against finding sheriffs to be state officials -- namely, sheriffs are paid out of the

31

county treasury, the sheriff's jurisdiction is limited to his
county, and the sheriff is elected locally by voters in his
county -- these facts showed that the county had only "an
attenuated and indirect influence over the sheriff's operations"
and did not outweigh the law which established sheriffs as
Alabama state officials when executing their law enforcement
duties.  Id. at 791-93.

The circumstances of the present case are unusual, and
require interpretation of New Jersey law, but the principles of
McMillian are equally applicable.  The New Jersey State
Constitution is of little help, for it does not reference the
role of the Business Administrator (Mr. Bonaparte's office) and
it is clear that, under normal circumstances, the Camden Business
Administrator would function only as a municipal official.  The
City of Camden's Charter, 195 N.J. Laws 476-77, and its Municipal
Code, Camden Mun. Code § 5-15, describe the role of the Business
Administrator,[10] which includes the "sole power of appointment"

---

[10] Section 5-15 of the Camden Municipal Code sets out in
detail the role of the Business Administrator:

A Business Administrator shall be appointed as
provided by the Charter.  He shall be chosen solely
on the basis of his executive and administrative
qualifications, with special reference to his
actual experience in or his knowledge of accepted
practice in respect to the duties of his office, as
hereinafter set forth.  Under the direction and
supervision of the Mayor, the Business
Administrator shall:

A.  Be responsible for the daily supervision of

for all positions with the Department of Fire, Camden Mun. Code §
55-3.  Mr. Bonaparte testified to his role as the final
appointing authority.  (Bonaparte Testimony, Nov. 19, 2004 Tr. at
104-05, 119, 123, 141.)

Defendants point out that on May 10, 2000, the State
dramatically intruded on the authority of the City, and in
particular, on its ability to appoint and dismiss officials.[11]

---

      all departments and department directors who
shall report directly to him/her.

B.    Assist the Mayor in the preparation of the
City budget and otherwise as the Mayor may
require.

C.    Create, promulgate and enforce rules regarding
the efficient operation of the City
government.

D.    Coordinate the activities of the various
departments to achieve maximum efficiency of
the City government.

E.    Maintain a continuing review and analysis of
budget operations, work programs and costs of
municipal services and the general financial
situation of the City government.

F.    Serve as head of the Department of
Administration, as set forth herein.

G.    Perform such other duties as other provisions
of this chapter or other provisions of this
Code of the City of Camden may require or as
the Council may otherwise prescribe.

H.    Administer a centralized purchasing system.

I.    Develop and administer a sound personnel
system.

[11] Prior to this date, the Annual Appropriations Act for the
State's 1998-1999 Fiscal Year, Pub. L. 1998, ch. 45, authorized
the Board to create a financial review board to approve,

City of Camden v. Kenny, 763 A.2d 777, 778-79 (N.J. Super. Ct. App. Div. 2000).  On that date, the Local Finance Board of the Division of Local Finance in the State Department of Community Affairs ("the Board") and its Director exercised its authority under the Local Government Supervision Act of 1947 ("Supervision Act") to supervise Camden as a municipality in "unsound financial condition."[12]  Id. at 778-79 (citing N.J. Stat. Ann. 52:27BB-54[13]).  Once subject to supervision under the Supervision Act,

---

implement, and enforce a financial plan for the City of Camden. The Board, through an emergency rule effective August, 1998, created the financial review board and gave it the power to "approve the annual budget and financial plan for the City; the issuance of debt; labor contracts and professional services contracts entered into during the time of supervision of the financial review board; and municipal expenditures if so directed, and to the extent specified by the Local Finance Board." [Emergency New Rule Adopted and Concurrent Proposed New Rule, Def. Ex. A to Docket Item 120.]  The Court observes that, consistent with the confusion that infused the issue of municipal liability during this trial, Defendants first provided the trial judge with this Emergency Rule in June, 2006, several years after the jury had reached its verdict.

[12] The New Jersey statute establishing the authority and independence of New Jersey municipal governments specifically reserved the right to limit the powers of a municipality that is in "unsound financial condition."  1950 N.J. Laws 471.

[13] This provision of the Supervision Act reads:

Article 4.  Municipalities in Unsound Financial Condition and School Districts Therein

52:27BB-54.  Purpose of article

The purpose of this article is to make provision for the imposition of special restraints upon municipalities in, or in danger of falling into, unsound financial condition and in this way to

the City was also subject to the Board's broad authority under
those provisions.  N.J. Stat. Ann. §§ 52:27BB-54 to -99.  Among
those powers was the power to "appoint and dismiss municipal
employees."  Id. § 52:27-BB-66.1.  The Board exercised its power
to appoint employees when in September, 2000, it appointed Mr.
Bonaparte to the position of Business Administrator, over the
objections of the Camden City Council and Mayor.  Kenny, 763 A.2d
at 779-81.  The City appealed the decision, first to the Board
itself in its supervisory capacity, and then to the New Jersey
Superior Court Appellate Division.  Id. at 781.  The Appellate
Division found that the Board acted within its authority under
the Supervision Act to appoint and dismiss municipal officials.
Id. at 781-84.[14]

---

        forestall serious defaults upon local obligations
        and demoralized finances that burden local
        taxpayers and destroy the efficiency of local
        services.

N.J. Stat. Ann. § 52:27BB-54.


    [14] According to the testimony of William Kramer, the State
also began to directly monitor the Fire Department, through the
New Jersey Division of Fire Safety ("DFS"), a division of the
Department of Community Affairs.  (Kramer Testimony, Nov. 19,
2004 Tr. at 214-16.)  Mr. Kramer testified that the DFS was
responsible for evaluating the Fire Department with respect to
its overtime budget, but the DFS also reviewed the operation of
the department, including facilities, equipment, and apparatus.
(Id. at 215-17.)  According to Mr. Kramer, it was the DFS that
recommended the creation of the additional Deputy Chief positions
that Plaintiffs Hailey and Crowder ultimately applied for.  (Id.
at 216-17.)

The circumstances of Mr. Bonaparte's appointment, however, do not resolve the question presented, which is whether Mr. Bonaparte's conduct when promoting (or failing to promote) certain officers to the position of deputy chief in the Fire Department can be ascribed to the State or the City.  Also inconclusive is Mr. Bonaparte's testimony that he was "employed by the State of New Jersey."  (Bonapart, Nov. 19, 2004 Tr. at 120.)  The Supreme Court in <u>McMillian</u> similarly observed that Alabama sheriffs are elected by the county and paid by the county, yet under Alabama state law when executing their law enforcement duties they represented the State of Alabama.  52 U.S. at 791-93.  As discussed, under New Jersey law, absent actual exertion of control by the State, the Business Administrator of Camden is most definitely a municipal employee when performing all his functions.  195 N.J. Laws 476-77; Camden Mun. Code § 5-15.  The mere existence of the State's authority to appoint and remove does not prove that it chose to exercise that authority through Mr. Bonaparte or, in particular, with regards to promotions to the rank of Deputy Chief in the Department of Fire.  As the court in <u>Kenny</u> observed, all local governments are generally subject to control of the state.  763 A.2d at 782 (quoting 1 Eugene McQuillin, Municipal Corporations § 3A.19 (3d ed. 1999).  If the mere prospect of control by the state were sufficient, this would vitiate municipal liability in every

36

instance.

The record contains conflicting evidence as to whether the State, exercising its authority under Section 52:27-BB-66.1 of the Supervision Act, took control of Mr. Bonaparte's function as the final decision-maker for selecting candidates for promotion. Mr. Bonaparte repeatedly testified that he had the final appointment power.[15] (Bonaparte Testimony, Nov. 19, 2004 Tr. at 104-05, 119, 123, 141.) Juliette Smith, Personnel Officer for the City of Camden since April, 1999, testified that Mr. Bonaparte reported to the Commissioner of the New Jersey Department of Community Affair ("DCA"). (Smith Testimony, Dec. 2, 2004 Tr. at 147.) She further explained when the Department of Community Affairs instituted a hiring freeze, beginning in

---

[15] Mr. Bonaparte himself provided conflicting testimony about his relationship to the State. This exchange resulted when asked by defense counsel about a memorandum prepared by Defendant Marini in response to a grievance related to Fire Department promotional practices:

> Q. Would the state under their total control that they had over the city, did the state have to approve this particular memorandum?
> A. If you are referring to Chief Marini's August 23 --
> Q. 2001?
> A. -- 2001 response to the grievance, no, the state would not have had to. I would have had to, and that's why it came to me.
> Q. I see.
> A. And as I was representing the state, then your answer would be correct.

(Bonaparte Testimony, Nov. 19, 2004 Tr. at 123.)

October 1, 1999 and extended at least until the Deputy Chief appointments in 2001. (Smith Testimony, Dec. 3, 2004 Tr. at 62.) According to Ms. Smith, when the City wanted to create new positions, they had to seek approval of a waiver from the DCA. (Smith Testimony, Dec. 2, 2004 Tr. at 143.) That waiver, however, was tied not to the individual the City had chosen to promote, but the position itself. (Smith Testimony, Dec. 3, 2004 Tr. at 25, 37.) Ms. Smith also testified that it was up to the Chief of the Fire Department to determine who was qualified for a Fire Department position and that it was Mr. Bonaparte who appointed Zienuik, Quinn and ultimately Hailey to their Deputy Chief positions. (Smith Testimony, Dec. 3, 2004 Tr. at 12-13, 37.) From this evidence (along with State and local law making the Business Administrator a municipal employee), it is possible to conclude that though the State had taken control of Camden's financial matters, and could appoint officials when it felt such action was necessary, the State had not taken over the City's role in choosing who could fill the Deputy Chief positions at issue in this case.

There certainly was evidence to the contrary.[16] Based on

---

[16] There is also case law showing that, at least in one instance, Mr. Bonaparte moved at the behest of the State when making an employment decision. On January 23, 2001, Mr. Bonaparte recommended to the Board that Camden's Chief Financial Officer ("CFO"), Richard Cinaglia, be removed from office. Cinaglia v. Levin, 258 F. Supp. 2d 390, 391 (D.N.J. 2003). The Board ultimately determined that Mr. Cinaglia should lose his

Ms. Smith's testimony that Mr. Bonaparte reported to the DCA, a
fact-finder could conclude that Mr. Bonaparte was under the
complete and actual control of the State.  Further, Defendant
Marini testified before the jury that the DCA told him to
recommend Zieniuk and Quinn for the provisional Deputy Chief
positions.  (Marini Testimony, Nov. 23, 2004 Tr. at 199-200.)  If
believed, this testimony would tend to show that the State did in
fact co-opt the selection process for promotions (as opposed to
just whether such positions were available).  Plaintiffs'
counsel, however, attempted to undermine this testimony, by
eliciting from Marini that over the course of three depositions
he never once revealed to counsel that the State told him who to
recommend and by showing that it was the DCA that previously
found Zieniuk had committed fraud (thus suggesting it was
incredible that they would them recommend him for a promotion).
(Id. at 197-98, 200, 224; Marini Testimony, Nov. 24, 2004 Tr. at
5.)  The process of weighing this conflicting evidence and making
necessary credibility determinations in order to decide what
entity can be held responsible for the promotional decisions at
issue is just the sort of analysis that must be made by the trial
judge in the first instance.  See Thompson v. Keohane, 516 U.S.
99, 111 (1995) (observing that trial judge is better situated to

_____

position as CFO, and when the City Council failed to act, ordered
that Mr. Cinaglia be removed pursuant to the Board's authority
under N.J. Stat. Ann. § 52:27BB-66.1.  Id.

make credibility determinations).

It is the role of the trial judge to determine, guided by final policymaker jurisprudence and consistent with state law, who was the final policymaker and whether his actions in this case could be ascribed to the City.  <u>Jett</u>, 491 U.S. at 737.  That determination was not made, the error was not harmless, and it requires a new trial.  Fed. R. Civ. P. 59(a)(1)(A); <u>see</u> <u>Pryer v.</u> <u>C.O. 3 Slavic</u>, 251 F.3d 448, 454 (3d Cir. 2001) (jury charge that did not fairly and adequately instruct the jury on applicable law is grounds for new trial); <u>Huddell v. Levin</u>, 537 F.2d 726, 741 (3d Cir. 1976) (confusion as to governing law and incorrect jury instructions required a new trial, where jury's confusion permeated its consideration of the case).

Further complicating any determination of municipal liability for Plaintiffs' failure to promote claim, and further emphasizing the necessity of a new trial, is the fact at least some aspects of Plaintiffs' failure to promote claims appear to have arisen either before Mr. Bonaparte's appointment (Plaintiffs' inability to sit for the Fire Chief's examination and possibly the provisional Deputy Chief appointments) and after Mr. Bonaparte left the position (continued delay in appointing Plaintiff Crowder as a deputy chief).[17]  None of the parties have

---

[17] Claims arising after Bonaparte's departure would implicate the Municipal Rehabilitation and Economic Recovery Act of 2002 ("MRERA"), N.J. Stat. Ann. §§ 52:27BBB-1 to -79.  As will

thoroughly addressed these other claims nor was the trial judge

able to, after the fact, assign final policymaking

responsibility, despite substantial testimony regarding the above

decisions.[18]  Therefore, the Court will order a new trial on the

---

be discussed below in Part III.A.4, MRERA lifted much of the
control the State had over Camden and restored its traditional
power under its own charter.  N.J. Stat. Ann. §§ 52:27BBB-25.
The Court does observe, however, that to the extent the
Magistrate Judge looked only to MRERA's tort and contract
liability provisions for State employees, rather than considering
whether the City regained the final authority to appoint and
remove officials (and who that final policymaker might be), the
Magistrate Judge erred.  The question of who the final
policymaker is, and whether a municipality may be held liable for
their actions, is based on that official's authority to act as
the ultimate decision-maker and whether, when performing that
function, they represent the State or the municipality.
McMillian, 520 U.S. at 784-93.  Thus, while state law
establishing that an official is subject to suit as a municipal
employee for state tort and contract claims may be one factor in
determining which governmental entity they represent while
performing a given function, it is not determinative.

[18] As previously discussed, to the extent the prior judge's
Opinion can be read to require reopening of the record in this
case, following the jury verdict, the Court cannot adopt such a
holding.  See United States v. White, 597 F. Supp. 2d 1269, 2009
WL 401621, at *8 (M.D. Ala. 2009) (finding "no authority that
would allow the court to reopen and enlarge an evidentiary record
after a jury verdict").  The faults in the case do not result
from a paucity of evidence but from confusion on the parts of all
involved as to the appropriate legal standard.  By way of
illustration, the judge stated that he only learned through the
City's second supplemental filing following oral argument on
post-verdict motions that Mr. Bonaparte lost his job following
the implementation of the Municipal Rehabilitation and Economic
Recovery Act of 2002 ("MRERA"), N.J. Stat. Ann. §§ 52:27BBB-1 to
-79.  Hailey, 2006 WL 1875402, at *13.  The judge was mistaken.
On December 3, 2004, Juliette Smith testified that the DCA
relinquished control of Camden in the Fall of 2002, and that by
the time Plaintiff Crowder was promoted to Deputy Chief in
January, 2003, Christine Tucker was a new business administrator.
(Smith Testimony, Dec. 3, 2004 Tr. at 20.)  The judge likely

issue of municipal liability under Sections 1981 and 1983 as to all of Plaintiff's claims regarding the failure to promote.[19]

    4.  <u>Municipal Liability and Hostile Work Environment</u>

Absent from the Magistrate Judge's Opinion and the briefing from all parties is any discussion of the City's liability for Plaintiffs' hostile work environment claims, also brought under Sections 1981 and 1983.  There is no suggestion that there was an official policy that caused a hostile work environment based on race in the Department of Fire.  To the contrary, Plaintiffs acknowledge that there was a formal policy in the City of Camden that prohibited racial discrimination.  (Pls. Ex. 41.)  Instead, Plaintiffs argue that this policy was ignored by the Department

---

missed this testimony because, at the time and thanks in large part to inadequate guidance from any of the attorneys in his courtroom, no party advocated for the judge's role in identifying the final policymaker under Sections 1981 and 1983.

    [19] So that the issue is clear moving forward, the Court will briefly address Plaintiffs' argument in favor of letting the verdict under the federal statutes stand against the City of Camden.  Plaintiffs argue that Defendants Leary and Marini went to great lengths to delay Plaintiffs' promotions, by writing letters on behalf of other (white) applicants for Fire Chief and discouraging the promotion of Crowder to Deputy Chief, while encouraging the promotion of other white officers.  (Pls. Br. Opp'n at 36-42.)  This conduct certainly might be sufficient to show causation -- that City officials helped cause the injuries Plaintiffs suffered from the failure to promote.  What it does not establish is that the City can be liable for this conduct.  As described at length above, the City can only be held liable for the conduct of a final policymaker in the particular area at issue acting on behalf of the City.  That question should have been resolved by the trial judge before the case was presented to the jury and only a new trial will correct this error.

of Fire and in particular Fire Chiefs Leary and his successor
Marini, which permitted (and in some cases encouraged) the
creation of a hostile work environment.

The Third Circuit has observed that "a policy or custom may
also exist where 'the policymaker has failed to act affirmatively
at all, [though] the need to take some action to control the
agents of the government is so obvious, and the inadequacy of
existing practice so likely to result in the violation of
constitutional rights, that the policymaker can reasonably be
said to have been deliberately indifferent to the need.'" Natale,
318 F.3d at 584 (quoting Board of County Com'rs of Bryan County,
Okl. v. Brown, 520 U.S. 397, 417-18 (1997)).  In this case,
Plaintiffs presented days of testimony regarding the hostile work
environment they endured.  They also testified to the efforts
they made to correct this problem, which included repeated
complaints to their superior officers and directly, in some
cases, to both Marini and Leary.  See Berg v. County of
Allegheny, 219 F.3d 261, 276 (3d Cir. 2000) (a "pattern of
violations" is generally needed to establish deliberate
indifference).  They further testified that nothing was done to
correct (either by reprimand or otherwise) the problems.

Thus, there was sufficient evidence from which a jury could
have found that the risk of a creating a hostile work environment
was so obvious that both the current and former Fire Chiefs knew

43

about it and failed to respond, such that they were deliberately indifferent.  In fact, Plaintiffs presented evidence that both Marini and Leary directly participated in the racially charged and discriminatory atmosphere within the Department, by using racial epithets, occasionally directed at Plaintiffs, and by participating in a racially discriminatory promotion process.

Defendants have two responses to this characterization of the vitality of Plaintiffs' federal hostile work environment claims.  First, they say, Plaintiffs waived any custom argument with regards to their hostile work environment claims.  Second, according to Defendants, the Fire Chiefs were not the final policymakers even as to preventing a hostile work environment within their own department.  The Court will reject the first argument, but concludes that the second argument calls for a new trial on this issue as well.

Upon review of the record, this Court finds that Plaintiffs did not waive the argument that the City of Camden knowingly permitted the Fire Department to develop a hostile work environment.  It is true that Plaintiffs' counsel told the Magistrate Judge, while the Judge was instructing the jury, that "[m]unicipal liability, custom, policy, ordinance, regulation" was "out," so that the jury was not given instruction number

21.[20]  This not sufficient to waive Plaintiffs' hostile work environment claim against the City under federal law.[21]  The jury was provided specific instructions on Plaintiffs' federal hostile work environment claim against the City of Camden, which stated (after laying out the elements of a hostile work environment

---

[20] That instruction previously read:

The plaintiffs claim that Defendant City of Camden, a municipality, is liable to the plaintiffs for the denial of their constitutional rights.  Defendant City of Camden may be liable where you find that a plaintiff has been deprived of his constitutional rights and such deprivation was done pursuant to a governmental custom, policy, ordinance, regulation or decision.

When a person is injured as the direct result of a government's policy, custom, regulation or decision, whether made by its lawmakers or by those officials whose statements or acts may fairly be said to represent official policy, Defendant City of Camden itself is responsible for the injury that it caused.

Defendant City of Camden may be liable to a plaintiff if you find that the deprivation was done pursuant to a custom, policy, ordinance, regulation, or decision of Defendant City of Camden that was the direct cause of the deprivation of the plaintiff's constitutional rights.  Whether a custom or policy exists is a question of fact for you to determine.

[21] Nor does it waive their claims of municipal liability for failure to promote, which were based not on an official policy or an informal, pervasive custom, but on allegations that the policymaker(s) themselves violated federal law, thus making the City liable.  See Natale, 318 F.3d at 584 ("The second [instance where a municipality may be liable for employee action] occurs where no rule has been announced as policy but federal law has been violated by an act of the policymaker itself.")

claim):

> To establish a hostile or abusive work environment
> against Defendant the City of Camden, a plaintiff
> must prove by a preponderance of the evidence that
> the workplace was permeated with discriminatory
> intimidation, ridicule, and insult that is
> sufficiently severe or pervasive to alter the
> conditions of the plaintiff's employment and create
> an abusive work environment.

(Dec. 6, 2004 Tr. at 27-28.)  The theme of Plaintiffs' closing

arguments is the image of Chinese water torture -- the constant

drip of discrimination and abuse that amounted to a hostile work

environment.  (Pls. Closing, Dec. 6, 2004 Tr. at 70.)  Plaintiffs

presented their entire case as one of pervasive abuse that went

unchecked by City officials.  They did not waive this argument

with a single blow during jury instructions.[22]

The failure to instruct the jury regarding custom and

---

[22] It appears from context that Plaintiffs' counsel merely
conceded that there was no officially promulgated policy, custom,
ordinance or regulation that violated federal law.  Plaintiffs'
counsel apparently misunderstood the legal definition of "custom"
for the purposes of municipal liability.  Plaintiffs' counsel in
his closing argument emphasized that though there was an official
anti-discrimination policy, "That's the policy, but it's not the
practice."  (Pl. Closing, Dec. 6, 2005 Tr. at 85.)  He went on:

> You heard from Juliette Smith.  That's the policy,
> but it's not the practice.  Somebody has to
> complain.  And if the Chief hears it and nobody
> complains about it, it didn't happen.  You are
> allowed to say things like spook and honky.  Guys
> say that to each other.  It's amazing.  There is a
> context for that in the Fire Department in the City
> of Camden?

(Id.)  Plaintiffs thus argued that the City of Camden acquiesced
to a custom that created a hostile work environment.

municipal liability, and without identifying a policymaker for
the purposes of preventing a hostile work environment within the
Fire Department, require a new trial as to municipal liability
for the hostile work environment claim as well.  As with
promotion, there is conflicting evidence regarding the repose of
authority and responsibility to prevent the development of a
hostile environment.  The Camden Municipal Code § 55-1 provides
for the establishment of a Department of Fire and places the Fire
Chief at its helm.  Section 55-2 states, in relevant part, "The
Department of Fire, subject to the direction and supervision of
the Fire Chief, shall . . . Make, administer and enforce rules
and regulations for the control, disposition and discipline of
the Department and its officers and employees . . ."  This
authority was not impacted by the Supervision Act, which provides
broad authority to eliminate financial distress, but does not
extend to discipline within the Department of Fire.  See Kenny,
763 A.2d at 783 (listing the Board's powers under the Supervision
Act, all limited to financial affairs).  Similarly, the Municipal
Rehabilitation and Economic Recovery Act of 2002 ("MRERA"), N.J.
Stat. Ann. §§ 52:27BBB-1 to -79, which ended the Board's
authority over Camden, N.J. Stat. Ann. § 52:27BBB-6(c), did not
co-opt the power to discipline the Department of Fire for the
State.  N.J. Stat. Ann. §§ 52:27BBB-1 to -79.  Though MRERA
provides for a Governor-appointed chief operating officer to aid

47

in municipal rehabilitation and economic recovery, it also makes clear that unless otherwise provided for, "the governing body shall retain all functions, powers and duties prescribed to it pursuant to the charter and administrative code of the municipality . . . ." N.J. Stat. Ann. §§ 52:27BBB-25. Consequently, there is reason to believe that the Fire Chief was the final policymaker for the purposes of preventing a hostile work environment within the Department of Fire, and his failure to do so subjected the City of Camden to liability under Sections 1981 and 1983.

Once again, there is no easy resolution to this post-hoc attempt at identifying the policymaker, because at least some evidence was presented which tends to show that the Fire Chief did not have final say even as to preventing a hostile work environment within his own department.[23] As with Plaintiffs' failure to promote claims, in the event Plaintiff again seeks to pursue municipal liability of Defendant City of Camden under 42 U.S.C. §§ 1981 and 1983, the determination of the identity and

---

[23] For example, Juliette Smith testified that complaints of discrimination should be brought to the Personnel Department, and those complaints were sent on to the Business Administrator to investigate. (Smith Testimony, Dec. 3, 2004 Tr. at 16, 41.)  She did acknowledge that, under the anti-discrimination policy, it was the supervisor's responsibility to take action if they received a report of a hostile work environment. (Id. at 41.) Further, Chief Marini testified that he had a responsibility to investigate all complaints of discrimination within his department. (Marini Testimony, Nov. 24, 2004 at 48-49.)

nature of the policymaker responsible for a hostile work environment within the Fire Department can only be made through a new trial, when this Court will be able to weigh the evidence, make credibility determinations, and ultimately decide the issue with the assistance of all counsel (who are by now well-acquainted with the legal principles governing this issue).

In sum, the Court will order a new trial on all of Plaintiff's race discrimination claims under Sections 1981 and 1983, including the failure to promote and the creation of a hostile work environment, against the City of Camden.  This is the only possible way to correct the confusion and error, from all sides, that occurred in the first trial.  Fed. R. Civ. P. 59(a)(1)(A); see Pryer, 251 F.3d at 454; Huddell, 537 F.2d at 741.  On retrial and guided by the law set forth in Part III.A.2, the Court will identify the relevant policymaker for all of Plaintiffs' federal claims against the City (without disturbing Plaintiffs' verdicts against the individual defendants), and determine whether that policymaker's actions, given the function in question, are to be assigned to the City or the State.

**B.   Compensatory Damages**

Defendants argue that the Magistrate Judge's Opinion left the fate of Plaintiff's lost wages awards unresolved.  Section I of the jury interrogatories for both Hailey and Crowder included the verdict for their race discrimination claims under Sections

49

1981 and 1983.  For both, Section I, subsection 4 required the jury to enter what damages, if any, the jury thought were appropriate.  Section I, subsection 4, part (a) provided a line to enter the amount of lost wages and benefits to be awarded. The jury wrote $116,000 for Crowder and $70,000 for Hailey.  In all subsequent sections (First Amendment claim and NJLAD claims), when asked to write the amount of lost wages and benefits, the jury wrote "SEE ABOVE."

After receiving the verdict, the parties discussed the verdict sheet with the Magistrate Judge.  The parties engaged in this exchange with the Court:

> [Plaintiff Counsel]: Your Honor, before we discharge the jury, on the "see above" aspects, it [sic] my interpretation -- I want to make sure the Court's going to mold the verdict that they didn't want to duplicate those damages.
>
> The Court: Right.
>
> [Plaintiff Counsel]: And I just wanted to make sure that that is the understanding of everyone.
>
> The Court: My understanding was the way it's written the damages are $70,000, plus punitives.
>
> [Plaintiff Counsel]: And plus the hostile work environment retaliation damages.  The 70 thousand is the only amount of damages throughout for lost wages and benefits.
>
> The Court: That's it.
>
> . . .
>
> [Plaintiff Counsel]: And we wanted to make sure the defense is clear, too.
>
> [Defense Counsel]: We just want to –
>
> The Court: $70,000.  And every time they say "see above" --

> [Plaintiff Counsel]: It's a reference to that
> amount.
> The Court: It's a reference to that amount, it's
> not $70,000 every time they say "see above."  Do
> you agree?
> [Defense Counsel]: I agree with that, Judge.

(Dec. 9, 2004 Tr. at 11-13.)

Defendants now suggest that because a new trial is required as to Plaintiffs' federal discrimination claims this would impact their lost wages award because some portion of that award is linked to each particular claim.  Plaintiffs respond that the jury found that each Plaintiff was entitled to the same amount of lost wages under each separate claim and while the award is not duplicative, so long as one claim remains Plaintiffs are entitled to those monies.  The Court agrees with Plaintiffs, especially in light of this Court's obligation to uphold lawful jury awards whenever reasonable.  Gagliardo v. Connaught Laboratories, Inc., 311 F.3d 565, 571 (3d Cir. 2002).  A plain reading of the verdict sheet makes clear that the jury determined that both Plaintiffs suffered lost wages due to Defendants' misconduct -- misconduct that is illegal under several different statutes, both federal and state.  The Court finds no basis to support the suggestion that only some smaller portion of lost wages should be allotted to Plaintiffs' NJLAD claims, where each time the jury wrote "SEE ABOVE" referencing the total amount of lost wages.

In an analogous situation, the Third Circuit has sought to

maintain the full amount of the jury verdict where a plaintiff
had brought suit under a federal statute that caps compensatory
damages, and a similar state statute with no such cap.
Gagliardo, 311 F.3d at 570-71.  In Gagliardo, the jury awarded
the plaintiff $2,000,000 in compensatory damages for both her
Americans with Disabilities Act ("ADA") claim and her
Pennsylvania Human Rights Act ("PHRA") claim, without
apportioning the award between the two.  Id. at 570.  The appeals
court affirmed the decision of the district court to apportion
all compensatory damages to the PHRA, so that they would not be
reduced by the federal cap.  Id. at 570-72.  In doing so, the
Court observed, "In this case, given the similarity of the claims
and the jury's unapportioned award of damages, it is reasonable
to infer that the jury intended to award its entire verdict to
Gagliardo." Id. at 571.  Similarly, here the jury awarded lost
wages under two similar provisions in corresponding federal and
state civil rights statutes and this Court is justified in
preserving the full amount of the award under the state statute.
See id. at 572.  Moreover, in this case, unlike in Gagliardo, the
jury made it explicit that its award of lost wages should be
applied to each statute.  The Court will consequently leave
Plaintiffs' awards for lost wages and benefits untouched, meaning
that Crowder is entitled to $116,000 and Hailey shall receive
$70,000, in addition to the compensatory damages (beyond lost

52

wages) awarded to Plaintiffs for their hostile work environment claims under NJLAD (which are also left untouched by the Magistrate Judge's Opinion and this Court's present opinion).

### C.    Amendment to Motion for JNOV or New Trial

The Court will very briefly address Defendants' motion to amend their motion for JNOV or new trial, filed two and a half years after the Magistrate Judge ruled on the original motion and the motion to reconsider.  The motion is untimely and fails on the merits.  First, Defendants cite no precedent (and the Court can find none) permitting a party to amend a motion for new trial after it has already been decided and reconsideration was denied. Second, to the extent Defendants seek relief from judgment under Rule 60(b), Fed. R. Civ. P., that motion is also untimely.  The Court cannot consider such a motion if it is not filed "within a reasonable time."[24]  Fed. R. Civ. P. 60(c)(1); Franklin Mint, Co. v. Boyd, No. 99-03823, 2001 U.S. Dist. LEXIS 5631 (E.D. Pa. 2001).  "What constitutes 'reasonable time' depends upon the facts of each case, taking into consideration the interest in finality, the reason for delay, the practical ability of the litigant to learn earlier of the grounds relied upon, and [the consideration of] prejudice [if any] to other parties."  Devon v.

---

[24] All motions under Rule 60(b) must be made within a reasonable time, but for motions under (1), (2), or (3) they must be made within one year after the entry of the judgment or order or the date of the proceeding.  Fed. R. Civ. P. 60(c)(1).

Vaugh, No. 94-2534, 1995 U.S. Dist. LEXIS 5559, at *4 (E.D. Pa. 1995) (quoting Kagan v. Caterpillar Tractor Co., 795 F.2d 601, 610 (7th Cir. 1986)).  In this case, there is no proffered reason for the delay and most certainly the litigant should have known of the grounds long ago.  Nor was it raised at trial, thus preventing Plaintiffs from taking any corrective measures (such as to amend the pretrial order).  Consequently, the Court find that Defendants' motion is untimely and cannot be considered.

Finally, even if the Court could consider this untimely argument, there is no plain error.  The error is neither clear nor obvious, for as Defendants themselves point out, a trial court is free to amend a pretrial order to "prevent manifest injustice."  Fed. R. Civ. P. 16(e).  Moreover, Plaintiffs' amended complaint alleges that both Leary and Marini played an active role in the discrimination Plaintiffs endured, so that it is neither clear nor obvious that they failed to sufficiently allege aiding and abetting under NJLAD.  (Am. Compl. ¶¶ 1-97.) For these reasons, the Court will decline to grant Defendants' leave to amend their motion for judgment as a matter of law or new trial.[25]

_____

[25] At oral argument before this Court on March 19, 2009, Defendants' raised yet another attack on Plaintiffs' NJLAD claims, one not presented in any of the extensive brief before this Court or the Magistrate Judge.  The Court will not consider it.  Moreover, the argument has no merit.  As best the Court can tell, Defendants' counsel now suggests that there is no cause of action against individuals under NJLAD for the creation of a

**D.   Motion to Consolidate**

Plaintiffs ask the Court to consolidate this matter with a related action pursuant to Rule 42(a), Fed. R. Civ. P., in which they have brought suit against the City of Camden alleging continued discrimination and retaliation.  "[A] court may consolidate cases if, in its discretion, 'consolidation would facilitate the administration of justice.'"  Doug Brady, Inc. v. New Jersey Bldg. Laborers Statewide Funds, 250 F.R.D. 171, 176 (D.N.J. 2008) (quoting Waste Distillation Tech., Inc. v. Pan Am. Resources, Inc., 775 F. Supp. 759, 761 (D. Del. 1991).  When exercising its broad discretion in this matter, even where there are common questions of law or fact, "a court should weigh the benefits of judicial economy against the potential for new delays, expense, confusion or prejudice." Id.   In the present instance, the risk of confusion, lead this Court to deny Plaintiffs' motion to consolidate.  The issues to be re-tried in this action involve punitive damages under NJLAD and municipal liability under Sections 1981 and 1983 for race discrimination

---

hostile work environment, but that suggestion is belied by the breadth of the aiding and abetting doctrine.  See Tarr v. Ciasulli, 853 A.2d 921, 928-29 (N.J. 1994) (announcing the aiding and abetting doctrine for individuals under NJLAD in a case claiming sexual harassment and hostile work environment); Hurley v. Atlantic City Police Dep't, 174 F.3d 95, 129 (3d Cir. 1999) (anticipating and applying the aiding and abetting doctrine for individuals to an NJLAD claim for sexual harassment and hostile work environment).  There was no plain error in permitting such a claim to survive here.

claims only, and only relate to events arising before the close of the previous trial. The difficulty of instructing a jury to consider only some issues in some relevant areas for certain periods of time outweighs any benefit from combining two similar actions. Thus, the Court will deny this request in the exercise of its discretion.

## IV. CONCLUSION

For the foregoing reasons, the Court will modify the Magistrate Judge's July 5, 2006 Opinion as discussed in Part III.A, but will leave the rest of the Magistrate Judge's Opinion untouched and it remains the law of the case. As a consequence, Plaintiffs' verdict against Defendants the City of Camden, Marini, and Leary is sustained, except as follows: (1) A new trial is required on the issue of punitive damages against the City of Camden under NJLAD and against the individual Defendants under Sections 1981, 1983 and NJLAD; (2) A new trial is similarly required for Plaintiffs' federal claims of race discrimination under 42 U.S.C. §§ 1981 and 1983 (failure to promote and hostile work environment) against the City of Camden. Furthermore, the Court finds that Plaintiffs' award of lost wages and benefits will not be altered by this Opinion and so Crowder is entitled to $116,000 and Hailey is entitled to $70,000 in lost wages against all Defendants. Finally, the Court will deny Defendants' motion to amend their motion for judgment as a matter of law or new

trial and Plaintiffs' motion to consolidate.

The accompanying Order is entered.


**s/ Jerome B. Simandle**
JEROME B. SIMANDLE
U.S. District Judge